Russell V. RAY, et al.,
Plaintiffs-Appellants,

v.

Nicholas A. KARRIS, et al.,
Defendants-Appellees.

No. 84–2382.

United States Court of Appeals,
Seventh Circuit.

Argued June 5, 1985.
Decided Dec. 16, 1985.

Michael J. Freed, Much, Shelist, Freed, Denenberg, Ament & Eiger, Chicago, Ill., for plaintiffs-appellants.

N.A. Giambalvo, Boodell, Sears, Giambalvo & Crowley, Chicago, Ill., for defendants-appellees.

Before COFFEY and FLAUM, Circuit Judges, and WRIGHT, Senior Circuit Judge.*

FLAUM, Circuit Judge.

Appellants, the minority shareholders of Water Tower Trust & Savings Bank, appeal from the district court's granting of appellees' motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a cause of action under section 10(b) and Rule 10(b)(5) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, section 17(a) of the Securities Exchange Act of 1933, 15 U.S.C. § 77a, *et seq.*, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (1980). We affirm the district court's order with respect to the securities claims. We reverse with respect to the RICO counts and remand to allow the district court to consider an amended complaint.

I.

Plaintiffs-appellants are the minority shareholders of Water Tower Trust and Savings Bank ("Bank") of Chicago, Illinois. They brought this four count action against appellees, the directors and majority shareholders of the Bank, on behalf of themselves as individual stockholders and derivatively on behalf of the Bank. The dispute arose over alleged misstatements and omissions with concomitant breaches of fiduciary duty surrounding the offering of the stock of the Water Tower Realty Co. ("Realty"), which prior to the spin-off was a wholly-owned subsidiary of the Bank. Appellants claim the alleged improprieties in this transaction resulted in injury to their interest in the Bank, as well as a direct injury to the Bank.

Taking the allegations in plaintiffs' complaint as true, as we must for purposes of evaluating the legal sufficiency of a cause of action, the transaction emerges as a purported conspiracy among the defendant-directors to appropriate the value of Bank assets held by Realty. Prior to 1981 the Bank became aware that banking regulations required the divestment of a 99-year ground leasehold in improved real estate held by Realty and located at 677–79 North Michigan Avenue, Chicago, Illinois (the "677–79 property"). The Bank did not operate any facilities on this property at that time, thus precipitating the need to make the spin-off. The Board of Directors decided to make the divestiture by offering the stock of Realty to the existing shareholders of the Bank. At this time the Board included defendants, Wallace Carroll, George B. Collins, Martin I. Gore, Howard J. Johnson, and Nicholas A. Karris (Defendant Bernard Leviton replaced Collins as a board member in October, 1982) and plaintiff James R. Frankell, who resigned in June, 1982.

In late 1981 and early 1982 certain transactions were consummated by the directors so that Realty was endowed with three major assets. First, Realty held the leasehold in the "677–79 Property." Subsequently, in early 1983, Realty granted the Bank an option to sublease this property for use as a commercial facility for a ten year term beginning in 1993. An independent appraisal pursuant to the offering of Realty stock stated that the option diminished the value of the leasehold by $1,000,000. Plaintiffs allege that this interest lacked any business purpose and was used only to artificially depress the value of Realty stock. Second, the Bank's leasehold in the property housing its commercial facilities, which was located at 717 North Michigan Avenue (the "717 Property"), was renegotiated so that Realty became the les-

---

* The Honorable Eugene A. Wright, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, is sitting by designation.

see, with Bank obtaining a sublease from its subsidiary. Plaintiffs allege that the sublease is prejudicial to the Bank's interest since Realty holds at a fixed rent for a fifty year term while Bank's sublease is only for a twenty-five year term with rent equal to fair market value following an initial ten year period during which the rent is fixed at a rate equal to Realty's. Finally, the directors obtained for Realty a two percent interest in a limited partnership formed to redevelop the "717 Property." Subsequent developments have made this interest quite valuable. Plaintiffs allege that the defendants were aware of the potential of the site for redevelopment but failed to disclose the information. Plaintiffs conclude that the market value of Realty's assets was in excess of $2,500,000 in the absence of the option on the "677–79 Property."

The final state of the alleged conspiracy was the spin-off of Realty through an offering of the subsidiary's stock to the shareholders of the Bank for a total price of $1,000,000. This price was far below the actual fair market value of Realty based on, according to the plaintiffs, the existence of the option on the "677–79 Property" and the omission of the true value of the 2% limited partnership interest. While the sale of an asset at an inadequate price may on appropriate facts amount to a fraud on the selling corporation, the shareholders, in theory, would be presented with an attractive investment opportunity. Defendants counteracted the attractiveness of the offering, according to the complaint, by issuing on March 29, 1983 an offering memorandum that through alleged material omissions and misrepresentations attempted to discourage participation in the offering. Plaintiffs allege a large number of misrepresentations and omissions relating to all aspects of the transaction, none of which is specifically relevant to our disposition of this case. The defendant directors were thus able to acquire a "disproportionately large percentage" of the Realty stock and deprive Bank of the full value of its interest in Realty.

The original complaint against the defendants filed in April of 1983 also sought a temporary restraining order and preliminary injunction. Judge Parsons, after a hearing, denied the temporary restraining order, but allowed the plaintiffs to participate in the Realty offering without prejudice to their rights in any pending litigation. Plaintiffs Russell Ray, Mary Rose Ray, Vance Ray, and James R. Frankel, did purchase Realty stock, allegedly for the purpose of protecting their interest in the former assets of the Bank. Plaintiffs Daniel C. McKay and Ivan Himmel never purchased any Realty stock. On June 20, 1983 plaintiffs filed their amended complaint alleging violations of Federal securities law and RICO as well as pendent state law claims. Defendant Johnson moved to dismiss the claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure while the remaining defendants sought summary judgment. Judge Parsons elected to treat all defendants' motions under Rule 12(b)(6) and dismissed plaintiffs' claims for failure to state a cause of action. The court held that the securities claims were inadequate since they failed to allege that the plaintiffs were "buyers" or "sellers" of securities as required by *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), and that the RICO counts were insufficient in that no predicate acts were alleged and the injury to the plaintiffs was the result of the predicate acts alone, rather than the alleged pattern of racketeering activity. The trial court clearly indicated that the case implicates only state law breach of fiduciary duty concerns.

## II.

While neither the trial court nor plaintiffs-appellants' briefs distinguish between the individual and derivative securities claims, the two counts do raise distinct legal issues and must be treated separately. The application of the appropriate principles to each count sustains the lower court's judgment that plaintiffs' complaint as amended failed to state a cause of action

under Rule 10b–5 of the Securities· Exchange Act of 1934.

## A.

 With respect to the individual securities claims this case presents a derivation of the fact pattern faced by the Supreme Court in *Blue Chip Stamps*. There, as in the present case, plaintiffs were claiming that they were defrauded out of the opportunity to purchase stock by the use of a deceptively pessimistic offering circular. The Court found that the plaintiffs could not take advantage of Rule 10b–5's implied civil remedy if they were not "purchasers" or "sellers" of securities. 421 U.S. at 749, 95 S.Ct. at 1931–32. Thus plaintiffs McKay and Himmel, who never purchased any Realty stock, fall squarely within the *Blue Chip* doctrine.[1]

With respect to the remaining plaintiffs the fact pattern deviates from *Blue Chip* in that these plaintiffs did purchase Realty shares. Superficially this presents the somewhat inapposite situation of a purchaser of shares of stock claiming he was defrauded by buying stock in an offering *in spite of* an allegedly deceptive offering memorandum designed to discourage such participation. While this raises a number of technical aspects of a Rule 10b–5 cause of action, such as issues of reliance,[2] it is most significant for what it illustrates about the nature of plaintiffs' claim. The

plaintiffs argue that they were forced to purchase the Realty stock to protect their investment in the Bank *because* of the fraud perpetrated *on the Bank* by the defendants. Clearly the gravamen of the individual securities count is the conduct of the directors with regard to Realty as an asset of the Bank. The plaintiffs' purchase of the stock was not induced by fraud; rather, it was a distinct, albeit related, consequence of a separate pattern of fraudulent conduct that injured the bank.

 Since the allegations here relate to the decision to sell Realty and the terms of that sale, not the conduct of the offering, plaintiffs' claims implicate only issues of the state law fiduciary duties of the defendants-directors. This case thus is indistinguishable from the line of cases following *Santa Fe Industries v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), which have held that the self-interested conduct of directors in dereliction of their fiduciary duty does not implicate the interest in full disclosure underlying Section 10(b) and Rule 10b–5. *See, e.g., Panter v. Marshall Field & Co.*, 646 F.2d 271, 287–88 (7th Cir.1981) (directors' policy of perpetuating their control in the face of a hostile tender offer states only a claim for breach of fiduciary duty); *O'Brien v. Continental Illinois National Bank & Trust*, 593 F.2d 54 (7th Cir.1979). In *O'Brien* the

---

**1.** Plaintiffs also attempt to rely on the "forced seller" doctrine established in *Vine v. Beneficial Finance Co.*, 374 F.2d 627, 634 (2d Cir.), *cert. denied*, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967). In the substantial number of cases where it has been applied a shareholder has been treated as a seller when the nature of his investment has been fundamentally and involuntarily changed. This circuit has yet to accept or reject the "forced seller" doctrine and we express no view on the continued efficacy or scope of the doctrine. It is enough to state that the plaintiffs have not shown any fundamental change in the nature of their investment. The crux of the claim is a diminution in the value of the plaintiffs' equity interest and this has been held to be outside of the scope of the "forced seller" concept. *Sargent v. Genesco, Inc.*, 492 F.2d 750, 764–65 (5th Cir.1974); *In re Penn Central Securities Litigation*, 494 F.2d 528, 537 (3d Cir.1974).

**2.** The plaintiffs contend in their briefs to this court that, "four of the six plaintiffs were damaged by being required to expend money to purchase stock in Realty which they already owned through their ownership of stock in Bank." As we noted above, the plaintiffs purchased the Realty stock after Judge Parsons denied their request for a temporary restraining order. Since the alleged omissions and misstatements were delineated in the plaintiffs' original complaint, filed with the district court before the plaintiffs purchased the Realty stock, the plaintiffs cannot contend that they relied on the alleged misstatements or omissions when they purchased the realty stock. If purchasers of stock did not rely on untrue or misleading statements in purchasing stock, they do not have a securities fraud cause of action. *See Atchley v. Qonaar Corp.*, 704 F.2d 355, 360 (7th Cir.1983).

court held that no 10b–5 cause of action would be implied where a trustee purchased the stock of companies of which it was a creditor on the grounds that the trust agreement left the decision of what stocks to buy to the trustees only. The sole remedy for the plaintiffs would have been state law breach of fiduciary duty claims. 593 F.2d at 59–61. Here the decision to sell Realty and at what price was in the sole discretion of the Bank's management. Thus the deception with regard to the purchase or sale of securities required by *Santa Fe*, 430 U.S. at 474–77, 97 S.Ct. at 1301–03, is not present in this case. The relevant deception, that which injured the plaintiffs, was only tangentially related to the offering of stock and had an impact primarily on the fairness of the transaction. It is axiomatic after *Santa Fe* and our decisions in *O'Brien* and *Panter* that no cause of action will be implied under the securities laws for alleged corporate mismanagement.[3]

### B.

The derivative suit filed by the plaintiffs on behalf of the corporation raises somewhat more difficult issues. Clearly the Bank was a seller of securities within the meaning of *Blue Chip Stamps*. The central issue with respect to the derivative action concerns the requirement of deception established by the *Santa Fe* decision: under what circumstances may the board of directors acting on behalf of the corporation be deemed to have "deceived" the corporation itself? We hold that plaintiffs' complaint establishes circumstances under which a Rule 10b–5 cause of action should not be implied.

■■■ The right of a shareholder to sue derivatively under Rule 10b–5 on behalf of the corporation was firmly established in this circuit by *Dasho v. Susquehanna Corp.*, 380 F.2d 262 (7th Cir.), *cert. denied*,

389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967). The central inquiry in such cases has turned on the esoteric issue of when the legal fiction that is a corporation is deemed to "know" of the fraudulent and self-interested schemes of the controlling shareholders or board of directors. *Wright v. Heizer Corp.*, 560 F.2d 236, 248–50 (7th Cir.1977). To the extent knowledge can be imputed to the corporation it is impossible to state that the corporation was deceived by or relied on any misrepresentations or omissions since forewarning would free non-interested parties to protect corporate interests through state law means. *Wright* at 248. Generally the "knowledge" of the corporate entity will turn on whether a disinterested majority of the shareholders or directors, depending on the state law requirements for the particular transaction, ratified the securities transference after full disclosure. *Maldonado v. Flynn*, 597 F.2d 789, 793 (2d Cir.1979); *Goldberg v. Meridor*, 567 F.2d 209, 214–18 (2d Cir. 1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978).

■■■ This case appears to be one of first impression since we are faced with a complaint which clearly establishes that at least one independent director and the minority shareholders were aware of the alleged fraudulent transaction prior to the consummation of any securities offering. Previously this court has faced situations only where the entire, or at least a majority, of the board of directors was interested in the transaction and minority shareholders could not be said to have had knowledge. In *Dasho* the court held that where the entire board of directors was interested or controlled, the corporation can only be deemed a party to the fraud where full disclosure is made to the shareholders. *Dasho v. Susquehanna Corp.*, 461 F.2d 11, 25 (7th Cir.), *cert. denied*, 408 U.S. 925, 92

---

**3.** Plaintiffs also seek relief under section 17(a) of the Securities and Exchange Act of 1933, 15 U.S.C. § 778(a) (1980). Whether a private damage remedy exists under this provision "is an open question in this circuit." *Peoria Union Stock Yards Co. v. Penn Mutual Life Insurance*,

698 F.2d 320, 323 (7th Cir.1983). Since, however, this section and Rule 10b–5 "track" each other closely, the lack of a 10b–5 cause of action would preclude section 17(a) relief also. *Teamster Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 530–31 (7th Cir.1985).

S.Ct. 2498, 33 L.Ed.2d 336 (1972). A similar situation was faced in *Bailey v. Meister Brau, Inc.*, 535 F.2d 982, 993 (7th Cir. 1976) (sole non-interested shareholder must receive full disclosure to view corporation as having ratified the transaction). In *Wright v. Heizer Corp., supra,* the court dealt with the situation where a majority, but not all, of the directors were interested in the alleged fraudulent conduct. The court held that a derivative action under Rule 10b–5 could be maintained where the lone minority director did not represent all the minority shareholders and did not participate in the negotiations of the transaction. 560 F.2d at 249. Significantly, the court in *Wright* declined to fully indorse as a general principle of law the statement in *Meister Brau* that:

> Where the controlling stockholder causes the corporation to engage in a securities transaction in which the stockholder has a conflict of interest, it has the obligation to disclose to the other stockholders information in its possession which reflects on the fairness of the transaction.

*Meister Brau,* 535 F.2d at 993. This illustrates that there is no definitive statement that all breaches of fiduciary duty are actionable in Rule 10b–5 derivative actions. After *Wright's* rejection of the full implications of *Meister Brau* the law in this circuit with regard to this type of derivative suit requires a case by case analysis based on the principles underlying the securities law.

Two factors distinguish the present situation from the three cases discussed above. First, in none of the other cases was there any indication that the relevant disinterested parties actually had knowledge of the alleged fraud prior to the actual transaction. Second, all these cases were decided prior to the Supreme Court's decision in *Santa Fe v. Green, supra.*

Section IV of the *Santa Fe* opinion states in unequivocal terms that federal securities law will not be applied to breaches of state law fiduciary duty where the policy of full disclosure is not implicated. *Santa Fe,* 430 U.S. at 477–80, 97 S.Ct. at 1302–04. *See Panter v. Marshall Field & Co.,* 646 F.2d

271, 287–88 (7th Cir.1981). As was discussed in part II–A of this opinion, *supra,* the gravamen of plaintiffs' complaint is that defendants breached their fiduciary duties by selling an asset for inadequate consideration in conflict with corporate interests. The fact that the claim is essentially a matter of state corporate law does not end our inquiry into the possible use of a Rule 10b–5 derivative suit in this case. Following the *Santa Fe* decision the Second Circuit reaffirmed the validity of the derivative action in Rule 10b–5 actions in *Goldberg v. Meridor,* 567 F.2d 209 (2d Cir. 1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978). In so doing, however, the Second Circuit was compelled to reevaluate the basis for such an action in a way that this court did not have to in its pre-*Santa Fe* decisions. The panel in *Goldberg* reasoned that the failure of the defendants to fully disclose the details of a securities transaction deprived both independent directors and shareholders of their right to defeat the transaction through corporate channels or state law remedies. 567 F.2d at 218–19. Thus the basis of this type of action is that the full disclosure policy, which is the "fundamental purpose" of the Act according to *Santa Fe,* 430 U.S. at 478, 97 S.Ct. at 1303, is implicated even in cases of breaches of state fiduciary law where the deception serves to deprive the corporation of its preventive remedies under state law. *Goldberg* at 218. *See, e.g., Maldonado v. Flynn,* 597 F.2d 789 (2d Cir.1979); *Alabama Farm Bureau Mutual Casualty Co. v. American Fidelity Life Insurance Co.,* 606 F.2d 602 (5th Cir.1979). *See also Healey v. Catalyst Recovery of Pennsylvania, Inc.,* 616 F.2d 641 (3d Cir.1980):

> We believe that this distinction concerning the flow of information between the majority and minority shareholders is persuasive. There is a strong federal interest, evidenced by the entire field of federal securities regulation, in ensuring a proper flow of information between the parties to a securities transaction. The Supreme Court has sanctioned a private cause of action under rule 10b–5 on behalf of sellers to enforce that federal

interest. *See Santa Fe, supra,* 430 U.S. at 477, 97 S.Ct. at 1302–03, *citing Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 169 n.9, 30 L.Ed.2d 128 (1971). All that *Goldberg* holds is that if some misrepresentation or omission by the defendant prevents the plaintiff from stopping the merger through a state injunction, there is a cause of action under rule 10b–5. Because this result flows from misinformation that harms the plaintiff, it is precisely the type of situation to which rule 10b–5 is addressed. 616 F.2d at 646.

Given the existing status of the law, our inquiry as to whether the Bank was "deceived" for purposes of implying a 10b–5 cause of action must proceed to examine whether the corporation acting through its disinterested directors or shareholders was frustrated in its ability to protect itself by the defendants' alleged omissions and misrepresentations. Two factual circumstances that appear on the fact of plaintiffs' complaint clearly establish that the alleged fraud was known to all the shareholders prior to the actual consummation of the transaction.

First, one of the plaintiffs, James R. Frankell, was alleged to be a director of the Bank until June, 1982. Since plaintiffs allege that the conspiracy was conceived by the Board in 1981 it can be presumed that Mr. Frankell was aware of the "fraud." We utilize this presumption because nowhere in the complaint is it alleged that Frankell was unaware or deceived. This court will not assume that a director is ignorant of the affairs of his corporation. *Cf.* Ill.Ann.Stat. ch. 32, § 8.65(b) (1984).[4] It is important to stress that we are not holding that the knowledge of one director is enough to impute knowledge to the corporation. However, where we are faced with a director-shareholder with potential knowledge who becomes a derivative plaintiff in a Rule 10b–5 action there is at least a strong indication that the alleged deceit was disclosed to the minority shareholders who could have pursued state injunctive remedies.

Second, and most significantly, plaintiffs' attempt to seek a temporary restraining order in the district court prior to the actual offering of Realty shares establishes that at least the essential facts of the alleged fraud were known to the plaintiffs-minority shareholders before the scheme was fully consummated. While the decision of whether and on what terms to sell an asset is left to the directors under Illinois law, Ill.Ann.Stat. ch. 32, § 157.33 (Smith-Hurd 1959) (repealed in 1984, but in effect at all times relevant here), a minority director or shareholder with prior knowledge could have pursued injunctive relief in the Illinois state courts. *Wright,* 560 F.2d at 250. The present situation is incompatible with the notion in *Goldberg, supra,* that the corporation is deceived when the minority shareholders lack the information to protect the corporate entity. Here the loss of state law injunctive remedies resulted not from the alleged nondisclosure but from the minority shareholders' attempts to seek relief in the wrong forum upon the wrong theory. Therefore we affirm the trial court's finding that the plaintiffs failed to state a cause of action under Rule 10b–5.

### III.

In addition to the securities counts plaintiffs also attempted to invoke the private civil damages remedy of RICO, 18 U.S.C. § 1964 (1980) on behalf of themselves indi-

---

**4.** The new Illinois Business Corporations Act *presumes* that a director who is present at a board meeting acquiesces in an action of the board of directors unless he takes affirmative steps to disassociate himself. Given this provision and the well established business judgment rule, under which a director is assumed to be actively participating in corporate affairs such that mere nonfeasance is actionable, *cf. Robin-*

*son v. Watts Detective Agency, Inc.,* 685 F.2d 729 (1st Cir.1982), *cert. denied sub nom. Consolidated Service Corp. v. Robinson,* 459 U.S. 1105, 103 S.Ct. 1191, 74 L.Ed.2d 953 (1983) (applying Massachusetts law), it would be anamolous for this court to presume that a director failed to discharge his or her fiduciary duty or was somehow deceived in the absence of any allegations of such ignorance by the plaintiffs.

vidually and derivatively on behalf of the Bank. Plaintiffs have alleged violations of sections 1962(b) (prohibiting the use of "racketeering" to acquire an interest in an enterprise), 1962(c) (prohibiting the conducting of an enterprises affairs through racketeering activity), and 1962(d) (prohibiting conspiracy to violate the other substantive provisions).[5] In finding that plaintiffs had failed to state a cause of action, the trial court ruled that plaintiffs had failed to allege sufficient predicate acts to establish "a pattern of racketeering activity" under section 1961(5),[6] and that the injury resulted from the alleged predicate acts, not the pattern of racketeering activity.

■ While there are obvious problems with the trial court's use of the "racketeering injury" concept in light of *Haroco v. American National Bank & Trust Co. of Chicago*, 747 F.2d 384 (7th Cir.1984), *aff'd,* — U.S. ——, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985) and *Sedima S.P.R.L. v. Imrex Co.,* — U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (both decided subsequent to the lower court ruling in this case), we must reverse the Rule 12(b)(6) dismissal and remand for repleading due to the insufficiency of the allegations of mail and wire fraud in the complaint. The pleadings allege a pattern of racketeering activity based on predicate acts of mail fraud (18 U.S.C. § 1341 (1980)) and wire fraud (18 U.S.C. § 1343 (1980))[7] without ever specifying the nature of the mailings and wire communications or how they relate to the scheme to defraud. The complaint provided:

(a) In connection with the Offering, the individual defendants at least twice used, or caused to be used, mail delivered by the United States Postal Service, thereby violating 18 U.S.C. §§ 1341 and 1961(1).

(b) In connection with the Offering, the individual defendants at least twice communicated, or caused communications to be made, by wire and interstate commerce, including instances of telephone communications, thereby violating 18 U.S.C. §§ 1343 and 1961(1).

These allegations constitute the entirety of plaintiffs' claim that there were mailings or wire communications in furtherance of the alleged fraudulent scheme.

Plaintiffs' allegations standing alone never indicate to which communications they refer. In their briefs plaintiffs allege that the distribution of the offering memorandum constituted the "mailings." While this may be true there is nothing in the complaint which gives the slightest hint that this is what is being claimed. The parties must at the minimum supply a general allegation of at least the nature of the mailings or wire communications so that the court can determine that a cause of action has been pleaded.

■ Before reaching the application of RICO the plaintiff must establish that the defendant committed two or more pred-

---

**5.** The full text of the provisions at issue is:

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(b) (1980);

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c) (1980);

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

18 U.S.C. § 1962(d) (1980).

**6.** 18 U.S.C. § 1961(5) (1980):

"pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.

**7.** Plaintiffs also alleged violations of the securities law as predicate acts. Given our holding that no cause of action was stated under Rule 10b–5 we need not consider this aspect of the pleadings.

icate acts contained in 18 U.S.C. § 1961(1) (1980). A complaint is not sufficient if it does not specify the nature of the predicate acts toa degree that will allow the defendants to comprehend the specific acts to which they are required to answer. The defendants in the present case are being sued under RICO based upon incidents of mail fraud and wire fraud and not directly for the entire fraudulent scheme so well detailed in plaintiffs' complaint. Plaintiffs here proceeded to detail all the elements of a civil RICO cause of action without adequate attention to the fact that RICO only serves to provide enhanced remedies for certain criminal activity carried on in a specified context. *See* Blakey & Gettings, Racketeer Influenced and Corrupt Organizations (RICO): Basic Concepts—Criminal and Civil Remedies, 53 Temp.L.Q. 1009, 1021 n. 71 (1980). The allegations of the criminal activity must also comply with the notice pleading requirements; pure assertions of a statutory violation standing alone are not sufficient. "In connection with this Offering" is too vague a phrase for either the court or the defendant to fully comprehend the nature of the claim.

■ We are not unmindful, however, that complaints are to be read liberally as required by the notice pleading theory underlying the Federal Rules of Civil Procedure. *Conley v. Gibson,* 355 U.S. 41, 47–48, 78 S.Ct. 99, 102–03, 2 L.Ed.2d 80 (1957). For this reason alone plaintiffs should be entitled to amend their pleadings and attempt to reallege the mail and wire fraud counts. *See* Fed.R.Civ.P. 15(a). The equity in allowing repleading is heightened by the fact that the plaintiffs may never have expected the full weight of the RICO claims to rest on their routine allegations of mail fraud and wire fraud. Neither did the trial court, which dismissed those claims in part because of the now-obsolete "racketeering injury" doctrine. Plaintiffs have not had the opportunity to use the liberal amendment provisions of the Federal Rules of Civil Procedure.

Finally, it is important to reemphasize the commitment of this court to a broad and literal reading of RICO in accord with Congressional intent and the dictates of the Supreme Court and our own past decisions. Our holding in this case does not mandate or sanction the use of the Federal Rules regarding the sufficiency of pleadings as a post-*Sedima* barrier to RICO suits in the federal courts.

### IV.

For these reasons, the dismissal of the plaintiffs' federal securities action is affirmed. The dismissal of the RICO action is reversed and remanded for further proceedings in accordance with this opinion.