**JEPSON, INC. and Ko Shin Electric and Machinery Company, Ltd., Plaintiffs–Appellants,**

v.

**MAKITA CORPORATION (f/k/a Makita Electric Works, Ltd.), et al., Defendants–Appellees.**

No. 93–1606.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 17, 1994.

Decided Sept. 13, 1994.

Jeffrey A. Orr, Frederick J. Sujat, Richard J. Burke, Larry Klayman, Paul J. Orfanedes (argued), Klayman & Associates, Washington, DC, for plaintiffs-appellants.

James K. Gardner, Phil C. Neal, Peter B. Newton, Ralph T. Russell, Bradley C. Twedt, Neal, Gerber & Eisenberg, Chicago, IL, William A. Zeitler (argued), Douglas J. Colton, Verner, Liipfert, Bernhard, McPherson & Hand, Washington, DC, Terry Ross, Catherine J. Pratt, Jodi Cohen, Claire P. McGreal, Keesal, Young & Logan, Long Beach, CA, for defendants-appellees.

Before CUMMINGS, KANNE, and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Ko Shin Electric and Machinery Co. ("Ko Shin") and Jepson, Inc. ("Jepson") sued Makita Corporation, Makita USA, Inc., and Makita Corporation of America for alleged violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO").[1] The district court dismissed the plaintiffs' amended complaint, concluding that it failed to state a RICO claim. We affirm.

## I. BACKGROUND

We assume the following facts, which we have culled from the amended complaint, to be true. *Hammes v. AAMCO Transmis-*

---

1. Plaintiffs also asserted a number of pendent state claims.

*sions, Inc.,* 33 F.3d 774, 777–778 (7th Cir. 1994); *Vicom, Inc. v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 775 (7th Cir.1994). Ko Shin is a Taiwanese manufacturer of power tools, and Jepson is its distributor in the United States. Makita Corporation (formerly Makita Electric Works, Ltd.) and its wholly-owned subsidiary, Makita Corporation of America, also manufacture power tools in Japan and the United States, respectively. Makita USA, Inc. distributes Makita products throughout the United States. We shall refer to the Makita defendants collectively as "Makita."

On April 1, 1988, Makita filed a complaint with the U.S. International Trade Commission ("ITC") alleging that Jepson and some thirty other firms had engaged in a variety of unfair trade practices in connection with the importation and marketing of power tools and accessories manufactured in Taiwan. These practices allegedly included trademark infringement, false representation, false advertising, and passing off. On August 9, 1988, pursuant to Makita's complaint, the ITC commenced an investigation into possible violations of section 337 of the Tariff Act of 1930 in the importation or sale of power tools and accessories manufactured in Taiwan.

Prior to and during the ITC's ensuing investigation, Makita contacted existing and prospective customers of Jepson, apprised them of the ITC complaint, described Jepson's products as low quality copies that infringed Makita's trademarks, and predicted that the ITC would order Jepson products removed from their shelves. Makita was also responsible for the following stories appearing in the press:

* In April 1988, the trade journal *Metalworking News* ran an article about Makita's complaint stating: "Covered in the Makita complaint were specific descriptions of about a dozen power tools ... and battery cartridges and chargers..... Most of the products are being manufactured in Makita's Buford, Ga. plant, with componentry sourced mainly in the U.S....." (The article attributed this information to William

Zeitler, a Bell, Boyd & Lloyd attorney representing Makita in the ITC proceeding.) The Administrative Law Judge presiding over Makita's complaint subsequently found that only three of the fifteen Makita products at issue in the proceeding were manufactured in the United States.

* In May 1988, an article entitled "Makita Petitions to Halt Import of Taiwanese Lookalikes" appeared in another trade journal, *National Home Center News.* The article attributed statements to Makita's counsel identifying Jepson and Ko Shin as two of the companies that Makita was attempting to prevent from importing lookalike products into the United States. It also featured a photograph of a sign displayed by Makita at the 1988 National Hardware Show in Chicago that warned customers: "BEWARE OF IMITATIONS! Make sure you are purchasing and promoting genuine Makita Power Tools, not low quality copies!"

* In July 1988, a second article appeared in the *National Home Center News* quoting Makita's General Counsel, Gerald Margolis, as stating that the ITC's decision to accept Makita's complaint "means Makita Corp. of America would be judged a U.S. industry and entitled to protection" from lookalike imports.

* Margolis amplified on that sentiment in a letter to the editor published in the September 1988 edition of *National Home Center News:*

In its meeting on Aug. 9, 1988, the U.S. International Trade Commission unanimously voted to institute an investigation in response to Makita's complaint against the manufacturers, importers and distributors of the offending Taiwanese tools. This vote means that the ITC has recognized that Makita U.S.A. and Makita Corp. of America are U.S. industries entitled to protection by the U.S. government, even though their parent company is in Japan.

Makita is confident that the ITC investigation will prove that its allegations are correct, and the U.S. government

will prohibit the offending products from entering the country.

\* In the February 1989 edition of *Wood Magazine,* Patrick Griffin, Makita's Vice President of Marketing, was quoted as claiming: "Our national sales force began spotting rip-offs of Makita Products at trade shows and in retail outlets and advertising.... The Taiwanese tools are poor-quality copies, and the public is being duped into believing otherwise."

Makita's predictions that it would prevail in the ITC proceeding proved overly optimistic. In a final decision rendered on July 31, 1989, the ITC found that Jepson had committed no violation of section 337. The Commission likewise found in favor of all but one of the other firms that Makita had cited in its complaint. Makita appealed the ITC's decision to the Federal Circuit, but that court affirmed in a decision rendered May 1, 1990.

Despite its loss before the ITC, Makita displayed the following sign at the National Hardware Show in Chicago in August 1989:

*BEWARE!*

Be sure you are buying

and promoting genuine

Makita power tools!

Copies of Makita Tools are

under investigation by the

International Trade Commission

To the extent the sign suggested that the ITC was still investigating Makita's competitors (and might find in Makita's favor), of course, it was misleading.

According to plaintiffs, all of these acts were part of a calculated campaign dating back to 1986 by Makita and other Japanese power tool manufacturers to drive their Taiwanese competitors out of the market. Purportedly as a consequence of Makita's conduct, Jepson and Ko Shin lost substantial sales from 1986 through 1990 and suffered an erosion of their market position, customer base, and potential for growth. Jepson and Ko Shin claim damages of $10 million, which they seek to be trebled to $30 million under RICO. 18 U.S.C. § 1964(c).

## II. RICO CLAIMS

In their amended complaint,[2] the plaintiffs charge Makita with five separate violations of RICO, including the use of income derived from racketeering activity in the operation of a racketeering enterprise, 18 U.S.C. § 1962(a), conducting the affairs of a racketeering enterprise through racketeering activity, § 1962(c), and conspiring to commit these acts, § 1962(d). Each of the RICO claims rests on the same predicate acts of racketeering, in this case purported acts of mail and wire fraud. *See* § 1961(1); 18 U.S.C. §§ 1341, 1343.

In essence, Jepson and Ko Shin contend that Makita set about to damage Jepson's reputation and thus reduce its sales by disparaging the plaintiff's products (and those of other Taiwanese manufacturers) in the eyes of their U.S. customers. This Makita allegedly did principally by two means: fostering stories in the trade press that were adverse to Jepson and Ko Shin and contacting current and potential customers to discourage them from purchasing Jepson products.[3] These acts were, in turn, allegedly

---

**2.** We refer to the amended complaint that plaintiffs filed on October 10, 1990. After the Magistrate Judge issued his report recommending that the amended complaint be dismissed, the plaintiffs submitted along with their objections to that recommendation a motion for leave to file a second amended complaint. The district judge never expressly ruled on that motion, but we take it as implicit in his subsequent order adopting the magistrate judge's recommendation and dismissing the case with prejudice that he denied the request. R. 194. Whether or not to permit a second amended complaint is, of course, a decision that lies within the district court's discretion. *Garcia v. City of Chicago,* 24 F.3d 966, 970

(7th Cir.1994). We find no abuse of that discretion here.

**3.** Jepson and Ko Shin also allege in passing that Makita engaged in a variety of other acts purportedly reflecting a pattern of racketeering activity. These include "exhibition of deceptive and misleading signs at the National Hardware Shows held in Chicago, Illinois in 1988 and 1989, trespass, false labeling or designation of origin of products, malicious prosecution of unfounded claims before the ITC, false and misleading advertising, unfair competition, unfair trade practices, trade libel, and antitrust violations." Amended Complaint ¶ 45. This broad

accomplished through a series of mail and wire communications that conveyed purported misrepresentations about the nature, quality, and characteristics of Jepson's products, about the potential consequences of buying Jepson products in light of the pending ITC investigation, and about the origin of Makita's own products.

## III. PROCEEDINGS BELOW

Makita moved to dismiss the amended complaint, contending that Jepson and Ko Shin had failed to adequately allege violations of RICO. The motion was referred to Magistrate Judge Edward A. Bobrick, who agreed with the defendants that the RICO claims were inadequate and, in a well thought out report, recommended dismissal of the amended complaint with prejudice. The district judge later adopted the report and recommendation in full. Although the district court found the RICO claims defective for multiple reasons, we focus on its rationale with respect to the predicate acts of mail and wire fraud.

Looking first at the purported acts of wire fraud, the court found that many had not been pleaded with the particularity required by Fed.R.Civ.P. 9(b). For example, Jepson and Ko Shin alleged that there were various telephone conversations with and facsimile transmissions to trade magazines and Jepson customers in furtherance of the purported scheme to defraud. Yet:

> [P]laintiffs' broad allegations of how the communications furthered the defendants' alleged scheme fail to provide any indication of who made the communications or when they took place; what plaintiffs do in their allegations of who made the communications is simply to "lump" all the defendants together, in violation of Rule 9(b). While such a tactic might be acceptable in situations where a plaintiff could not be expected to distinguish between the various corporate insiders or officers controlling a corporation, plaintiffs in this case fail to distinguish, not between various *corpo-*

allegation lacks sufficient detail to lend support to the RICO claims, however, and plaintiffs do

*rate insiders,* but between the three distinct *corporations* which they are suing. Report and Recommendation at 11 (emphasis in original) (citations omitted). The court acknowledged that the dates of the magazine articles noted above provided at least some reference point for the timing of the communications that allegedly culminated in those articles; yet, the court pointed out, the complaint provided no similar reference point for the alleged contacts with Jepson's existing and prospective customers. *Id.* at 11–12. Finally, the court noted that the complaint had failed to allege that the wire communications took place in interstate commerce, thus raising a question as to whether they even fell within the purview of section 1343. *Id.* at 12.

The court found similar defects in the mail fraud allegations. Again, although the dates of the trade journal articles provided a reference for the alleged mailings that were connected with those articles, no time frame was supplied for the mailings Makita purportedly sent to existing and prospective customers of Makita. Moreover, the sources of these mailings could not be determined from the complaint, with the possible exception of one or two instances in which the complaint attributed a published statement to an identified individual (for example, the "letter to the editor" Makita's general counsel, Gerald Margolis, sent to *National Home Center News* ).

Alternatively, the district court found the fraud allegations to be outside the scope of the mail and wire fraud statutes. In essence, the court pointed out, the statutes proscribe use of the mails and interstate wires in furtherance of a scheme to defraud or in order to obtain money or property by means of false or fraudulent representations. Report and Recommendation at 14. Thus, although the mailings and wire communications need not be fraudulent in and of themselves, they must in some manner further a scheme that entails some type of fraudulent misrepresentations or omissions. *Id.* (citing *United States v. Wellman,* 830 F.2d 1453, 1461–62

not rely on it here.

(7th Cir.1987)). Several of the specific statements attributed to the defendants—*e.g.,* statements about the pendency and import of the ITC investigation—were not, in fact, misrepresentations at all, the court noted. *Id.* at 14–15. More fundamentally, the court thought that the gist of the alleged scheme—to disparage Jepson's products and frighten away its customers—did not fall under the rubric of fraud. The mail and wire fraud statutes focus on the protection of property rights, the court reasoned. Jepson and Ko Shin had alleged injuries to their "economic performance, market position, and customer base" (Amended Complaint ¶ 36), but had not identified damage to a cognizable property interest. *Id.* at 16–17. Thus, although the complaint might suggest that Makita engaged in anticompetitive conduct, it did not adequately allege a scheme to defraud cognizable under the mail and wire fraud statutes. *Id.*

### IV. ANALYSIS

We review the district court's decision to dismiss the case de novo, granting Jepson and Ko Shin the benefit of every reasonable inference that may be drawn from well pleaded facts in their amended complaint. *Uni\*Quality, Inc. v. Infotronx, Inc.,* 974 F. 2d 918, 920 (7th Cir.1992). Like the district court, we find the mail and wire fraud allegations in the amended complaint to be wanting in critical respects. Because those defects leave the plaintiffs' RICO claims without the necessary foundation of predicate acts, we agree that dismissal of the case was appropriate. *See Graue Mill Dev. Corp. v. Colonial Bank & Trust Co. of Chicago,* 927 F.2d 988, 992–93 (7th Cir.1991); *Ray v. Karris,* 780 F.2d 636, 644–45 (7th Cir.1985).

We find, at the outset, considerable persuasive force to the district court's conclusion that the nature of the scheme alleged in this case is beyond the scope of the mail and wire fraud statutes. It is difficult to discern from the complaint any property right that Jepson and Ko Shin, or in the alternative their customers, were deprived of by the defendants' alleged conduct. The true injury of which Jepson and Ko Shin complain appears to be a competitive injury (*i.e.,* loss of their market share); and the Ninth Circuit has rejected this type of harm as a foundation for a claim of mail or wire fraud. *Lancaster Community Hosp. v. Antelope Valley Hosp. Dist.,* 940 F.2d 397, 405–06 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992). Nonetheless, we find it unnecessary to explore that issue in depth because we agree that the particular acts of mail and wire fraud on which the plaintiffs rely either have not been pleaded with particularity or fail to reflect misrepresentations that reasonably could be characterized as fraud. We therefore leave for another day whether the type of anticompetitive conduct that Jepson and Ko Shin have alleged would support a claim for mail or wire fraud.

Rule 9(b) provides that "[i]n all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity." As we observed in *Vicom, supra:*

> The rule is said to serve three main purposes: (1) protecting a defendant's reputation from harm; (2) minimizing "strike suits" and "fishing expeditions"; and (3) providing notice of the claim to the adverse party. *See Uni\*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 924 (7th Cir.1992); *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987). Although some have questioned Rule 9(b)'s effectiveness in serving these purposes, the caselaw and commentary agree that the reference to "circumstances" in the rule requires "the plaintiff to state 'the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" *Uni\*Quality,* 974 F.2d at 923 (quoting *Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 683 (7th Cir.1992)).

20 F.3d at 777 (footnote and further citations omitted). Of course, Rule 9(b) applies to allegations of mail and wire fraud and by extension to RICO claims that rest on predicate acts of mail and wire fraud. *See, e.g., Schiffels v. Kemper Fin. Servs., Inc.,* 978 F.2d 344, 352 (7th Cir.1992); *Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1020 (7th Cir.1992); *Graue Mill,* 927 F.2d at 992–93.

Thus, "loose references to mailings and telephone calls" in furtherance of a purported scheme to defraud will not do. *R.E. Davis Chem. Corp. v. Nalco Chem. Co.*, 757 F.Supp. 1499, 1516 (N.D.Ill.1990). Instead, the plaintiff must, within reason, describe the time, place, and content of the mail and wire communications, and it must identify the parties to these communications. *Schiffels*, 978 F.2d at 352–53; *Midwest Grinding*, 976 F.2d at 1020; *Uni\*Quality*, 974 F.2d at 923–24; *U.S. Textiles, Inc. v. Anheuser–Busch Cos.*, 911 F.2d 1261, 1268 n. 6 (7th Cir.1990); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir.1993); *R.E. Davis*, 757 F.Supp. at 1516. These details are mandated not only by Rule 9(b), but by the very nature of a RICO claim. For "[w]ithout an adequately detailed description of the predicate acts of mail and wire fraud, a complaint does not provide either the defendant or the court with sufficient information to determine whether or not a pattern of racketeering activity has been established." *R.E. Davis*, 757 F.Supp. at 1516. The complaint must also allege facts from which it reasonably may be inferred that the defendants engaged in the scheme with fraudulent intent, *McDonald v. Schencker*, 18 F.3d 491, 495 (7th Cir.1994); *Graue Mill*, 927 F.2d at 992. Moreover, when the complaint accuses multiple defendants of participating in the scheme to defraud, the plaintiffs must take care to identify which of them was responsible for the individual acts of fraud. *Vicom*, 20 F.3d at 778.

Our independent review of the amended complaint discloses that it does not comport with Rule 9(b). The allegations concerning the mail and wire communications with Jepson's customers are the most glaringly deficient. Although the amended complaint identifies the general nature of the purported misrepresentations made to these customers, no detail beyond that is supplied. The complaint simply alleges "multiple instances" of Makita using the mails and wires to contact "existing and potential customers of Jepson and numerous other Taiwanese manufacturers and importers and distributors of electric power tools and accessories from Taiwan, to induce them not to purchase Jepson, or other Taiwanese electric power tools and accessories." Amended Complaint, ¶ 44(b), (d). The complaint fails to identify, for example, which customers were contacted and when. Specificity requirements may be relaxed, of course, when the details are within the defendant's exclusive knowledge. *Nelson v. Monroe Regional Medical Ctr.*, 925 F.2d 1555, 1567 n. 7 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 285, 116 L.Ed.2d 236 (1991). But that is not entirely true in this instance. It would seem likely that Jepson and Ko Shin became aware of communications with Jepson's customers not from the defendants but from the customers themselves. The plaintiffs cannot therefore complain of an inability to ascertain the details of these communications; even if they learned of the contacts through other sources, they have as much access as the defendants to the customers who can flesh out the circumstances of the mailings and wire communications involved. *See Schiffels*, 978 F.2d at 353. In short, the few conclusory sentences that Jepson and Ko Shin have devoted to this set of mail and wire communications in their amended complaint are completely wanting in the details that Rule 9(b) mandates.

The allegations concerning contacts with the trade magazines that ran articles about the ITC investigation are not flawed to the same degree. The complaint fails, once again, to identify which publications were contacted and the dates on which these communications occurred. However, assuming that the articles which eventually appeared were the culmination of these allegedly fraudulent mailings and wire communications, the dates of the articles and the identity of their publishers provide some sense of whom Makita contacted and when, as the district court acknowledged. *See In re Colonial Ltd. Partnership Litigation*, 854 F.Supp. 64, 108 (D.Conn.1994) (Cabranes, J.). As the district court also pointed out, the complaint does not make clear which of the defendants was responsible for these communications. For the sake of convenience in our discussion, we have lumped all three defendants under the single name "Makita." This is an indulgence that a plaintiff should avoid when it comes to attributing acts of

mail and wire fraud, however. It may be that Jepson and Ko Shin are not privy to the particular individuals responsible for the letters, telephone calls, and faxes of which they complain, and they might therefore be excused from specificity on that subject. *P & P Marketing, Inc. v. Ditton,* 746 F.Supp. 1354, 1362 (N.D.Ill.1990); *see generally Nelson,* 925 F.2d at 1567 n. 7; *Boston & Maine Corp. v. Town of Hampton,* 987 F.2d 855, 866 (1st Cir.1993). Even so, defendants are entitled to be apprised of the roles they each played in the alleged scheme, and absent a compelling reason, a plaintiff is normally not entitled to treat multiple corporate defendants as one entity. *See Vicom,* 20 F.3d at 775–76; *Sears v. Likens,* 912 F.2d 889, 893 (7th Cir.1990); *Mills,* 12 F.3d at 1175. We will assume for purposes of our discussion that this omission can also be overlooked as well, however, given that the three corporate defendants in this case are related corporations that can most likely sort out their involvement without significant difficulty.

■ But even with the benefit of these assumptions, the press-related allegations remain defective at a fundamental level. The amended complaint offers no details as to the particular content of any given mailing to or wire communication with the trade press. Only from the content of the articles that the press actually published can one infer what Makita might have said in these communications. Yet, from the face of these articles, we detect only one or two statements that might be characterized as misrepresentations.

For example, the April 18, 1988 issue of *Metalworking News* reported that "most" of the Makita products implicated by the company's ITC complaint were manufactured in Georgia with predominantly domestic components, and the article attributed this representation to Makita's outside counsel. Amended Complaint ¶ 32. Yet, according to the complaint, an ALJ eventually determined that only three of the fifteen Makita tools at issue in the proceeding were in fact manufactured domestically. *Id.* ¶ 33. Assuming that the attorney's statement was accurately reported, that it may be attributed to Makita, and that counsel knew his statement to be

false or was indifferent to its truth, perhaps the article could be said to reflect a misrepresentation on Makita's part. But this is nearly all we can find even remotely suggesting that fraudulent misstatements may have been made to the press.

■ Jepson and Ko Shin cite the May 1988 article in *National Home Center News* as containing a particularly "egregious" example of the false and fraudulent statements Makita was allegedly disseminating. Appellants' Br. at 9. But, according to the complaint, that article merely noted that Jepson and Ko Shin were "two of the respondents in the ITC proceeding and targets of a cease-and-desist order which would 'halt the flow of lookalike products made by 11 Taiwanese manufacturers and force dealers to remove products from their shelves under penalty of fines.'" Amended Complaint ¶ 29(b). We do not see what is false or misleading about such a statement. Jepson and Ko Shin were, so far as we can determine, targets of Makita's complaint, and the complaint did seek an order of the kind described. Accompanying the article was a picture of the sign Makita had displayed at the 1988 Hardware Show admonishing customers to "Beware of Imitations" and to purchase only "genuine Makita Power Tools, not low quality copies." Clearly partisan statements about "look-alikes" and "low quality copies" are standard fare in free market advertising, however, and within the context of the facts alleged here, we do not think they hint of fraud.

■ The plaintiffs also insist without elaboration that the article appearing in the July 1988 issue of *National Home Center News* and the letter to the editor from Makita's general counsel appearing in the same journal contained false statements about the effects of the ITC's ongoing investigation. Both articles expressed Makita's sentiment that the ITC's decision to act upon the company's complaint indicated that Makita would be treated as a domestic manufacturer entitled to protection from infringing imports. Amended Complaint ¶ 31. In addition, the letter to the editor noted Makita's confidence that "the ITC investigation will prove that its allegations are correct, and the U.S. government will prohibit the offending products

from entering the country." *Id.* Both types of statements fall within the range of opinions and predictions that parties and their attorneys routinely make while legal proceedings are underway, and they normally would not supply the foundation for a fraud claim, at least absent further allegations revealing that they were made in bad faith. *Fisher v. Samuels,* 691 F.Supp. 63, 68–69 (N.D.Ill.1988).

■ Finally, the plaintiffs remind us that Makita's Vice–President of Marketing was quoted in the February 1989 issue of *Wood Magazine* as claiming that "[o]ur national sales force began spotting rip-offs of Makita Products at trade shows and in retail outlets and advertising" and that "[t]he Taiwanese tools are poor-quality copies, and the public is being duped into believing otherwise." Amended Complaint ¶ 29(c). Again, we find terms like "rip-offs," although perhaps disparaging of Makita's competitors, not to rise to the level of fraud. Certainly nothing in the complaint suggests that, contrary to Makita's representation, there were not at least some "low quality rip-offs" of Makita's products circulating in the market. Recall that although most of the companies cited in Makita's complaint were exonerated, not all were; so there is nothing obviously false about these particular statements.

■ We note that in seeking leave to file a second amended complaint (a request that the district court did not grant, *see* n. 2, *supra*), Jepson and Ko Shin identified a number of press releases disseminated on behalf of Makita and Bell, Boyd & Lloyd, Makita's outside counsel, by a public relations consultant. R. 183 Exs. B, C. These releases included the following kinds of statements:

> Power tool supplier Makita USA, Inc. is "giving notice that we will not sit idly by while poor quality, 'look alike' products from Taiwan flood the market," says president Noris Hattori.

> \* \* \* \* \* \*

> "It's an ironic situation," comments Hattori. "Makita has made a substantial investment in American industry—creating jobs for American workers producing products for the American market. Now the Taiwanese come waltzing in with cheap versions of our products. Confused consumers are buying those copies instead of Makita's products, and if the International Trade Commission doesn't stop allowing Taiwanese rip-offs into the country, manufacturing growth at Makita USA is going to be much slower than anticipated."

> \* \* \* \* \* \*

> "Like a number of other foreign-owned U.S. manufacturing companies," notes Zeitler, "Makita has developed a U.S. manufacturing capability that qualifies it as a U.S. manufacturer, for relief from unfair competition from imports."

R. 183 Ex. C. · Like some of the quotes attributed to Makita and its representatives in the amended complaint dismissed by the district court, these statements reflect Makita's aggressive posture vis à vis its competitors from Taiwan as well as its publicly confident face concerning the outcome of the ITC proceeding. But although Jepson and Ko Shin label the cited statements as "false," it is not at all apparent from the complaint just what is untrue. Labels like "poor quality," "cheap," and "lookalike" may be offensive to the companies whose products are being described, but they are also inherently subjective expressions that are ill-suited as the basis for mail and wire fraud claims. Zeitler's assertion that Makita had attained the status of a domestic manufacturer and its attendant protection is, of course, yet another example of the optimistic legal assessments that attorneys routinely tender on behalf of their clients. The plaintiffs have failed to identify anything concretely wrong about Zeitler's opinion, and we likewise find it does not suffice as an indication of mail or wire fraud.

■ We recognize, of course, that a given mailing or wire communication need not be fraudulent on its face in order to constitute an act of mail or wire fraud; even innocuous communications can qualify for this purpose so long as they are incident to an essential part of the scheme. *United States v. Green,* 786 F.2d 247, 249 (7th Cir. 1986); *see also Schmuck v. United States,*

489 U.S. 705, 711, 109 S.Ct. 1443, 1448, 103 L.Ed.2d 734 (1989); *United States v. Biesiadecki,* 933 F.2d 539, 545 (7th Cir.1991). But in this case the plaintiffs rely on the mailings and wire communications themselves as the acts of fraud. Amended Complaint ¶ 44. Each complaint must, of course, be assessed on its own allegations; but here, even a generous interpretation of the amended complaint does not support the theory that Makita engaged in mail or wire fraud. Even to the extent that one or two of the statements Makita purportedly disseminated through the mails or wires may have contained misrepresentations, they are certainly not sufficient to establish the pattern of racketeering that RICO requires.

### V. CONCLUSION

Because the amended complaint does not adequately detail the predicate acts of mail and wire fraud, we agree with the district court that the RICO claims were defective. Because the RICO claims supplied the only basis for federal jurisdiction, the pendent state claims were properly dismissed as well. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). The judgment of the district court is therefore AFFIRMED.