Robert N. **CORLEY** and Vera M. Corley, Plaintiffs–Appellants,

v.

**ROSEWOOD CARE CENTER, INC. OF PEORIA, et al., Defendants–Appellees.**

Nos. 96–2464, 96–3758, 97–1815 and 97–2052.

United States Court of Appeals, Seventh Circuit.

Argued June 6, 1997.

Decided April 29, 1998.

Richard L. Steagall, John P. Nicoara, Nicoara & Steagall, Peoria, IL, Sherman L. Cohn (argued), Georgetown University Law Center, Washington, DC, for Robert and Vera Corley.

Steven M. Hamburg (argued), Stephen L. Ukman, Summers, Compton, Wells, & Hamburg, P.C., St. Louis, MO, for Rosewood Care Center, Inc. of Peoria, Rosewood Care Center Holding Company, Peoria Real Estate, Inc., Hovan Enterprises, Inc., HSM Management Services, Inc., HSM Develop-

ment Corporation, Larry Vander Maten, Individually and as Trustee of the Larry Vander Maten Revocable Trust, and Darrell Hoefling, Individually and as Trustee of the Darrell Hoefling Revocable Trust in Nos. 96-2464, 96-3758, 97-1815, and 97-2052.

Before CUMMINGS, RIPPLE, and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Robert Corley and his mother Vera allege that defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, by engaging in a scheme to defraud the residents of two nursing homes—one in Peoria and the other in East Peoria, Illinois.[1] The gravamen of that scheme, according to Corley, was a classic "bait and switch," in which defendants made certain promises to induce Corley to place his mother in defendants' nursing home and then reneged on those promises. Corley maintains that he and numerous others were victims of this "bait and switch" scheme. The district court initially sustained Corley's complaint, finding that it sufficiently alleges a pattern of racketeering activity under the RICO statute. On summary judgment, however, the court found that Corley had failed to come forward with evidence to establish that RICO pattern. The main appeal before us today challenges that determination. The three additional appeals challenge later orders entered by the district court relating to costs and a monetary sanction. For the reasons that follow, we reverse the summary judgment on Corley's RICO claim and remand that claim for further proceedings. We also vacate the award of costs and the monetary sanction.[2]

## I.

Underlying Corley's RICO claim is a contract he executed on October 25, 1989 with defendant Rosewood Care Center, Inc. of Peoria ("Rosewood"). That contract outlined the care Rosewood would provide to Corley's mother at its Peoria nursing home, and the contract was conditioned on Rosewood's guarantee that Mrs. Corley would be provided a private suite for the duration of her stay. Under the contract, the initial base rate for that private suite was $70 per day. Corley maintains that defendants induced him to execute the contract by making a series of promises relating to the quality of care his mother would receive at Rosewood. In addition to the guarantee of a private suite, defendants told Corley that his mother would be provided a choice of two entrees at every meal and that she would be permitted to remain in the Peoria facility as a Medicaid patient even if she were to exhaust her personal resources. Defendants also told Corley that in the event of a price increase, the differential between the rate for a private suite and the rate for a semi-private room would remain constant. Corley contends that Rosewood never had any intention of honoring these promises.

According to Corley, defendants began to implement the "switch" component of their scheme shortly after he executed the contract and settled his mother into the Peoria facility. After only two months, Corley received a letter from Rosewood's administrator indicating that the demand for Rosewood's services had exceeded expectations and that as a result, Rosewood would be required to limit the number of residents residing in private suites. The letter urged Corley to consider transferring his mother to a semi-private room and warned that if he did not, the price of her private suite would increase by $14 per day. Corley refused to give up his mother's private suite, however, and on March 1, 1990, Rosewood raised the per-day rate for that suite to $84. Rosewood

1. Although Robert Corley and his mother are both named plaintiffs, for ease of reference we shall refer to him as "Corley" or "the plaintiff" with the understanding that the claims he makes are advanced both on his behalf and on behalf of his mother.

2. Corley's complaint includes state claims within the district court's supplemental jurisdiction. The district court declined to exercise jurisdic-

tion over those claims once it entered judgment for defendants on the federal claim. Because we are reversing that judgment, however, the state claims should be reinstated on remand.

When we refer to "Corley's complaint" in this opinion, we mean the fourth amended complaint as subsequently supplemented by the third amendment to that complaint.

subsequently raised the rate to $88 per day as of March 30, 1990, and then to $122 per day as of October 29, 1990.[3] In the meantime, Rosewood also began to offer residents only one entree choice at meals, despite its earlier promise that it would provide Mrs. Corley two entree choices. If Mrs. Corley refused the available entree on any given day, she was served leftovers from the previous day. Finally, in the fall of 1990, Rosewood notified residents that its Peoria facility would not be honoring the promise of continuing care if residents should exhaust their personal resources. Residents would instead be required to relocate to Rosewood's East Peoria facility in order to obtain that guarantee of continuing care. With respect to Corley and his mother, the complaint alleges that defendants utilized the United States mails in furtherance of their scheme to defraud when they mailed the executed contract to Corley sometime after October 25, 1989, when Rosewood's administrator sent his December 1989 letter urging Corley to transfer his mother to a semi-private room, when they mailed notices of rate increases to Corley on March 30, 1990 and October 24, 1990, and when they mailed him bills on a monthly basis from March 1, 1990 through March 1, 1992. On March 31, 1992, Corley removed his mother from Rosewood's Peoria nursing home.

The predicate acts of racketeering alleged in the complaint are not limited to Corley and his mother, however, for the complaint alleges that similar acts of mail fraud were directed against other Rosewood residents and their relatives. Because defendants had not yet produced the names of those other residents by the time Corley filed his fourth amended complaint, the details alleged in that complaint are somewhat sparse. The complaint alleges, however, that the same or similar representations and promises that had been made to Corley were also made to other residents and their relatives who con-

tracted for private suites between the May 21, 1989 opening of the Peoria facility and the Rosewood administrator's December 1989 letter, which urged relatives of private-suite residents to consider a transfer to a semi-private room. Although Corley did not list the names of all such residents given the lack of discovery, the complaint includes allegations about seven other residents in addition to Vera Corley. The complaint alleges that similar mailings in furtherance of the scheme were made by defendants with respect to each of those residents. Moreover, these and other residents were also affected by Rosewood's pricing practices, and by its refusal to honor the promise of two entree choices at each meal and the guarantee of continuing care with Medicaid reimbursement. According to the complaint, a number of residents transferred to Rosewood's East Peoria facility once defendants announced that the Peoria nursing home would not be accepting Medicaid reimbursement. Yet on October 8, 1991, defendants decided that the East Peoria facility also would no longer accept Medicaid reimbursement, thereby effectively nullifying any guarantee of continuing care. Certain residents of the East Peoria facility aggrieved by that decision filed suit in the Circuit Court of Tazewell County, Illinois, alleging that Rosewood Care Center, Inc. of East Peoria had violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS ¶¶ 505/1 *et seq.*, when it canceled the guarantee of continuing care. They prevailed on that claim before the circuit court.[4]

Corley alleges that the foregoing acts violated the following provision of the RICO statute:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirect-

**3.** Corley was notified on October 24 that the rate for his mother's suite was being raised to $128 per day, but that was reduced to $122 on October 29 after a mistake was corrected relating to the level of Mrs. Corley's care.

**4.** After hearing oral argument in this appeal, we were notified that Tazewell County Circuit Judge

Bruce W. Black found after a bench trial that Rosewood Care Center, Inc. of East Peoria had violated the Illinois statute by making such a promise of continuing care. *See Hopp v. Rosewood Care Ctr., Inc. of East Peoria,* No. 92 L 74, slip op. (Dec. 5, 1997).

ly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Corley maintains that the racketeering enterprise here is comprised of the various corporations controlled by individual defendants Larry Vander Maten and Darrell Hoefling, including defendant Rosewood, its corporate parent Rosewood Care Center Holding Company, defendant Peoria Real Estate, Inc., which owns the site on which Rosewood's Peoria facility is located, Rosewood Care Center, Inc. of East Peoria, and Hovan Enterprises, which manages the Peoria facility. The corporations comprising the enterprise allegedly operate as a single unit under the direction and control of Vander Maten and Hoefling. The complaint further alleges that Vander Maten and Hoefling conducted the affairs of the enterprise through the predicate acts of mail fraud detailed above for the purpose of maximizing their income and net worth. According to the complaint, the predicate acts of mail fraud are sufficient to form a pattern of racketeering activity under the statute. Corley also alleges that by investing income derived from this racketeering activity in the operations of the enterprise, the corporate defendants violated 18 U.S.C. § 1962(a).[5]

The district court found in response to defendants' motion to dismiss that Corley had sufficiently alleged a claim under the RICO statute.[6] In denying the motion to dismiss, the court rejected defendants' arguments that certain of the predicate acts of mail fraud were insufficiently detailed in the complaint and that the acts alleged did not comprise a pattern of racketeering activity. Subsequent to that decision, Corley filed a series of notices of claims of additional predicate acts that he believed were also a part of the RICO pattern. Those included allegations addressed to the filing of a false prospectus in connection with a public bond offering, the failure to pay real estate transfer taxes based on a false exemption certification, the making of false statements to a local board reviewing property tax assessments, and the filing of false federal and state income tax returns by the individual defendants. The district court told the parties it would decide on summary judgment whether these additional acts could be considered part of the pattern of racketeering activity. After the district court then indicated at a hearing that it was inclined to grant defendants summary judgment on those additional notices of claims, defendants moved for summary judgment on the core RICO claim itself, arguing that if the acts alleged in the notices of claims were excluded, plaintiffs could not establish conduct qualifying as a pattern of racketeering activity. Corley responded with a motion for additional discovery under Fed. R. Civ. P. 56(f), in which he asked the court to delay any ruling on the summary judgment motion until the parties had completed discovery. After briefing was completed on that motion and on the motion for summary judgment, the district court granted summary judgment to defendants with respect to the notices of claims of additional predicate acts and on the core RICO claim itself. In so doing, the court necessarily denied Corley's Rule 56(f) motion for additional discovery. Corley then asked the district court to reconsider its summary judgment decision. He argued that the court had erred on the merits of that ruling and in refusing to afford him the opportunity to conduct additional discovery before being required to respond. By that time, Judge Mihm had recused himself, and the case was transferred to Judge Mills, who eventually refused to reconsider Judge Mihm's grant of summary judgment. Judge

---

**5.** That provision of the RICO statute provides in pertinent part as follows:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person had participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. 18 U.S.C. § 1962(a).

**6.** At that point, the case was assigned to Judge Michael M. Mihm. It was only transferred to Judge Mills after Judge Mihm later recused himself.

Mills also declined to exercise supplemental jurisdiction over Corley's state law claims, and he therefore dismissed those claims without prejudice. Corley then took the first of four appeals (No. 96–2464) before us today.[7]

## II.

### A.

■ As is so often the case with civil RICO, the viability of Corley's claims turns on whether he has established a pattern of racketeering activity. Such a pattern is an essential element of a claim under both sections 1962(a) and 1962(c). *Vicom, Inc. v. Harbridge Merchant Serv., Inc.*, 20 F.3d 771, 778–79 (7th Cir.1994). The RICO statute itself is not particularly helpful in defining the all-important pattern requirement, as it notes only that a pattern requires at least two acts of racketeering activity within a ten-year period. 18 U.S.C. § 1961(5). And "racketeering activity" is defined to include, among other things, any act indictable under specified provisions of the United States Code, including 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud). *See* 18 U.S.C. § 1961(1)(B); *McDonald v. Schencker*, 18 F.3d 491, 494 (7th Cir.1994). The Supreme Court has indicated that although two predicate acts of racketeering are necessary to form a pattern, two acts alone generally will not suffice. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237, 109 S.Ct. 2893, 2899–900, 106 L.Ed.2d 195 (1989). Rather, in addition to at least two predicate acts, a RICO plaintiff must show "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Id.* at 239, 109 S.Ct. at 2900 (emphasis in original). In other words, a RICO plaintiff like Corley must show continuity plus relationship with respect to the alleged predicates. *Id.*; *see also Sedima,*

*S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985).

■ The "relationship" prong is relatively uncontroversial here. The predicate acts of racketeering satisfy the relationship test if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240, 109 S.Ct. at 2901 (internal quotation omitted); *see also Vicom*, 20 F.3d at 779. Neither defendants nor the district court have suggested that the core predicate acts comprising the alleged "bait and switch" scheme are insufficiently related to satisfy the relationship prong.[8] So we accept that the core predicate acts are related and proceed to consider continuity. *See Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992).

The Supreme Court dealt extensively with this more controversial aspect of the pattern requirement in *H.J. Inc.* There, the Court explained that a RICO plaintiff must show "that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." 492 U.S. at 240, 109 S.Ct. at 2901 (emphasis in original). "Continuity," the Court observed, is both a closed- and open-ended concept, in that it refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. at 2902.

■ Continuity over a closed period may be demonstrated by proof of "a series of related predicates extending over a substantial period of time." *Id.* at 242, 109 S.Ct. at 2902. The Court cautioned, however, that "[p]redicate acts extending over a few weeks

---

7. Corley's second appeal (No. 96–3758) challenges the award of costs to defendants on the RICO count. His third and fourth appeals (Nos. 97–1815 & 97–2052) relate to the bond the district court required with respect to those costs and to a monetary sanction the court imposed for a motion Corley filed relating to that bond. We shall set forth the facts relevant to those appeals later in this opinion.

8. Defendants have argued, however, that the additional predicate acts set forth in the later-filed notices of claims are not sufficiently related to the core "bait and switch" scheme to be included in the pattern of racketeering activity.

or months and threatening no future criminal conduct do not satisfy this requirement" because "Congress was concerned in RICO with long-term criminal conduct." *Id.; see also Vicom,* 20 F.3d at 779–80. Prior to *H.J. Inc.,* this circuit had looked to five factors in analyzing whether predicate acts are sufficiently continuous to give rise to a pattern of racketeering activity: "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.1986). We have continued to look to the *Morgan* factors after *H.J. Inc.* when considering whether a closed period of related conduct is sufficient to establish continuity. E.g., *Vicom,* 20 F.3d at 780; *Midwest Grinding,* 976 F.2d at 1023; *Olive Can Co. v. Martin,* 906 F.2d 1147, 1151 n. 2 (7th Cir.1990).

▮ "Open-ended continuity," by contrast, may involve predicate acts occurring over a short period of time so long as there is a threat that the conduct will recur in the future. *H.J. Inc.,* 492 U.S. at 241, 109 S.Ct. at 2902 ("open-ended continuity" refers to "past conduct that by its nature projects into the future with a threat of repetition"); *see also Midwest Grinding,* 976 F.2d at 1023. Such a threat is present when: "(1) 'a specific threat of repetition' exists, (2) 'the predicates are a regular way of conducting [an] ongoing legitimate business,' or (3) 'the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes.'" *Vicom,* 20 F.3d at 782 (quoting *H.J. Inc.,* 492 U.S. at 242–43, 109 S.Ct. at 2902); *see also Midwest Grinding,* 976 F.2d at 1023.

In denying defendants' motion to dismiss, the district court concluded that Corley had sufficiently alleged a pattern of racketeering activity. Yet by the time the case reached the summary judgment stage, the court found that proof of such a pattern was lacking. The court determined in response to the summary judgment motion that Corley

had presented evidence of only five predicate acts of mail fraud, the first of which occurred on or about October 25, 1989, when Rosewood mailed Vera Corley's contract to her son, and the last of which occurred approximately fourteen months later (on December 18, 1990), when Rosewood's counsel (Stephen L. Ukman) mailed to the Illinois Attorney General a response to Corley's November 18, 1990 complaint.[9] The district court therefore viewed Corley's complaint and evidentiary materials as establishing a closed-ended period of racketeering activity that spanned fewer than fourteen months, which the court did not view as "the type of long-term conduct Congress was concerned with when it enacted RICO." (R. 534 at 21.) Corley's primary argument in response to that ruling is that the court considered only the predicate acts of mail fraud involving him and his mother while neglecting the allegations that similar "bait and switch" tactics were employed against other Rosewood residents. The district court noted that the complaint made such allegations but that the summary judgment record included no evidentiary materials to support that aspect of Corley's claim. (*Id.* at 20 ("Corley proffers neither affidavits nor depositions to support these allegations.").) The court therefore concluded that the claim was limited to the five predicate acts of mail fraud involving Corley and his mother.

Whether or not the racketeering scheme was properly so limited is at the heart of Corley's main appeal here, for if the predicate acts of racketeering were addressed only to a single victim for a closed-ended period of twelve to fourteen months, we would agree that Corley would have considerable difficulty satisfying the "continuity" requirement. *See, e.g., Vicom,* 20 F.3d at 780 (durational aspect of closed-ended continuity not satisfied by racketeering predicates spanning a nine-month period); *Midwest Grinding,* 976 F.2d at 1024 (same); *J.D. Marshall Int'l v. Redstart, Inc.,* 935 F.2d 815, 821 (7th Cir.1991) (thirteen-month period insufficient). But Corley asserts that his

---

**9.** Yet according to the court, not even all five of those acts could be considered because defendants' scheme to defraud had come to fruition on December 31, 1989. We discuss that issue *infra,* at 23–25.

RICO claim cannot be so limited because many other residents of Rosewood's Peoria and East Peoria facilities also were victims of the same or related schemes. He concedes that the summary judgment record is devoid of evidence relating to those victims, but he assigns blame for that omission to the lower court, which first restricted his ability to investigate instances of fraud with respect to those victims and then granted summary judgment in the face of his contention (and his motion under Fed.R.Civ.P. 56(f)) that additional discovery was needed to enable him to respond to the request for summary judgment. We shall consider the discovery issue in due course, after pausing to address defendants' assertion that Corley's pleading was in any event inadequate.

### B.

■ We need only consider the discovery issue, of course, if we agree with the district court that Corley adequately alleged a pattern of racketeering activity in his fourth amended complaint. But we think it clear that once Corley's allegations with respect to other Rosewood residents are considered, his complaint is sufficient. In light of those allegations, defendants' "bait and switch" mail fraud scheme is much broader than merely the five predicate acts considered by the district court at the summary judgment stage below. Corley alleges, for example, that defendants made similar misrepresentations to other prospective Rosewood residents and their relatives about the availability of private suites, the availability of two entree choices at each meal, and the guarantee of continuing care with Medicaid reimbursement first at the Peoria facility and then at the Rosewood facility in East Peoria, Illinois. He also alleges that numerous others were overcharged for the services defendants provided. As with defendants' execution of the scheme with respect to Vera Corley, numerous mailings to other residents and their relatives allegedly furthered defendants' scheme. Thus, with reference to the *Morgan* factors, this broader scheme, even if closed-ended, involved innumerable predicate acts of mail fraud occurring over a significant period of time, and it was directed against a substantial number of victims, all of whom experienced distinct injuries. *See Morgan,* 804 F.2d at 975; *see also Arenson v. Whitehall Convalescent and Nursing Home,* 880 F.Supp. 1202, 1210–11 (N.D.Ill.1995) (*Morgan* factors support finding of "continuity" in context of mail fraud scheme affecting all nursing home residents). It is not entirely clear to us, in fact, that the scheme as alleged by Corley could not be described as "open-ended" in the sense that it reflects defendants' ongoing way of conducting a legitimate business enterprise. But in any event, the scheme clearly does not have the natural end point that has caused us to find a lack of continuity in some closed-ended cases. *See Vicom,* 20 F.3d at 782–83; *Midwest Grinding,* 976 F.2d at 1025; *Uni\*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 922 (7th Cir.1992); *Olive Can,* 906 F.2d at 1151. Rather, the nature of the conduct alleged here would seem to carry with it the threat that defendants may continue to conduct business at their various nursing homes in what may be a fraudulent way. We believe, then, that if Corley's allegations are accepted as true, he could indeed prove a set of facts consistent with those allegations that would establish a pattern of racketeering activity under the RICO statute. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

■ Yet defendants contend that the allegations on which we have focused should not be considered because they are not sufficiently specific to satisfy Fed.R.Civ.P. 9(b), which requires that "the circumstances constituting fraud ... be stated with particularity." We have indicated that this rule applies to allegations of mail and wire fraud, including where those offenses are alleged to comprise predicate acts of a RICO pattern. *See Jepson, Inc. v. Makita Corp.,* 34 F.3d 1321, 1327 (7th Cir.1994); *Vicom,* 20 F.3d at 777; *Midwest Grinding,* 976 F.2d at 1020. To satisfy the particularity requirement, we have required a RICO plaintiff to allege the time, place, and content of an allegedly fraudulent communication, as well as the parties to that communication. *Jepson,* 34 F.3d at 1328; *Vicom,* 20 F.3d at 777. In this case, Corley generally identifies the content of allegedly fraudulent communications, but in a

number of instances is unable to state the specific time or place that a communication was made, nor does he identify the particular Rosewood resident or relative to whom the communication was directed. But Corley's complaint also emphasizes that such specific information is in the hands of defendants, who at the time had resisted his attempts in discovery to obtain a list of other Rosewood residents affected by the alleged scheme. We have noted on a number of occasions that the particularity requirement of Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim, and that is most likely to be the case where, as here, the plaintiff alleges a fraud against one or more third parties. *See Schiffels v. Kemper Fin. Serv., Inc.*, 978 F.2d 344, 353 (7th Cir.1992); *Uni\*Quality*, 974 F.2d at 923; *see also Jepson*, 34 F.3d at 1328; *Arenson*, 880 F.Supp. at 1208. Corley's complaint identifies certain other Rosewood residents to whom the various misrepresentations were communicated, and with respect to the identified residents, he details the circumstances of the alleged frauds with sufficient particularity. To the extent the complaint makes allegations relating to other classes of unidentified Rosewood residents, however, we believe that Rule 9(b)'s particularity requirement must be relaxed if, at the time the complaint was filed, Corley had been denied access in discovery to information that would identify those residents. Predicate acts of racketeering relating to those residents may be pled more generally, as Corley has done here by referencing his own experiences with Rosewood in contracting for the care of his mother and alleging in some detail that other residents and their relatives also were victimized by the identical scheme. In sum, then, we agree with the district court that Corley's fourth amended complaint satisfies the particularity requirements of Rule 9(b) and sufficiently alleges a pattern of racketeering activity. It was therefore not subject to dismissal for failure to state a claim.

### C.

That conclusion requires us to consider the discovery dispute on which the instant appeal turns. Central to the district court's decision to grant summary judgment was the fact that Corley had failed to proffer any evidence in support of his allegations with respect to other alleged victims of defendants' scheme. Corley offers two explanations for that deficiency here, both addressed to the district court's management of the discovery process. First, Corley explains that defendants only produced the names of other Rosewood residents on February 1, 1995, the same date on which the district court entered a stay of formal discovery. Approximately one week earlier, moreover, the district court had granted defendants' motion for a protective order addressed to the informal investigation and statement-gathering process Corley had been pursuing. Corley asserts that the combination of these two circumstances effectively prevented him from offering evidence on summary judgment relating to the other alleged victims of defendants' scheme. According to Corley, then, the district court should not have proceeded to resolve defendants' summary judgment motion without first permitting him to conduct additional discovery.

■ We first address the propriety of the district court's January 24, 1995 protective order. Defendants sought that order after learning that Corley had been conducting interviews of potential non-party witnesses under oath with a court reporter present.[10] Because Corley apparently had no intention of attempting to use the sworn stenographic statements that emerged from those interviews as depositions, he did not provide defendants with notice of the interviews or with an opportunity to attend and to inquire of the potential witnesses. *Cf.* Fed.R.Civ.P. 30(b) (outlining type of notice required for depositions). Yet upon learning of Corley's investigative procedure, defendants objected, arguing to the district court that the sworn stenographic statements qualify as depositions even if Corley may choose to call them something else. Defendants therefore urged the court to prohibit Corley from continuing to take such sworn statements without pro-

---

**10.** The potential witnesses presumably were voluntarily cooperating with Corley's investigation, as the district court's authority had not been invoked by Corley to secure their presence.

viding defendants with formal notice under Rule 30(b). The district court agreed with defendants, concluding that the sworn stenographic statements in fact were depositions that required formal notice under the rule. The court therefore granted defendants' application for a protective order, which had the· effect of preventing Corley from taking any further sworn stenographic statements from potential witnesses.

■■■■■ Our review of the district court's handling of this matter is necessarily deferential. District judges enjoy broad discretion in settling discovery disputes and in delimiting the scope of discovery in a given case. We will not disturb the district judge's resolution of a discovery dispute unless we find that the court abused its discretion. *Gile v. United Airlines, Inc.*, 95 F.3d 492, 495 (7th Cir.1996). A district court would necessarily abuse its discretion, however, by basing its decision on an erroneous conclusion of law. *Id.* We believe that is what occurred here.

The district court viewed Corley's investigative technique as tantamount to a deposition under the Federal Rules, and the court therefore prohibited Corley from pursuing that technique without also complying with those rules. The court's protective order meant, of course, that Corley could only take sworn statements from potential non-party witnesses if he provided defendants with notice and an opportunity to be present. But we see nothing in the Federal Rules that would support such a restriction on counsel's private inquiry into the facts underlying his client's claim. Even if the investigation procedure employed by Corley appeared to the court like a deposition, Corley clearly had determined not to treat the interviews as such. Thus, although court reporters were present and witnesses presumably were questioned under oath, the interviews in fact were not depositions precisely because Corley had not complied with the requirements of Rule 30(b). The statements could thus not later be used as depositions under Rule 32. *Cf. Dunn v. United States*, 442 U.S. 100, 111–12, 99 S.Ct. 2190, 2196–97, 60 L.Ed.2d 743 (1979) (transcribed statement made under oath before notary public not a deposition

because rules applicable to depositions not followed).

But the fact that the statements could not be used as depositions does not mean, as the district judge apparently assumed, that Corley was not entitled to take them. The Supreme Court has long recognized that as part of his investigation and trial preparation, counsel may choose to take sworn statements from individuals having knowledge of the claims or defenses at issue. *See Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). In *Hickman*, in fact, the issue before the Court was the extent to which a party's opponent would be entitled to discover information relating to such oral and written statements. *Id.* at 497, 67 S.Ct. at 387. The present version of Fed.R.Civ.P. 26 addresses that issue in the aftermath of *Hickman*, providing that "documents and tangible things" prepared in anticipation of litigation or trial are discoverable "only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed.R.Civ.P. 26(b)(3); *see also generally* Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2023, at 329–30 (2d ed.1994) (hereinafter "Wright & Miller"). The rule further provides that a party may obtain his own prior statement about the action or its subject matter without making such a showing, as may a non-party who has made a similar prior statement. Fed. R.Civ.P. 26(b)(3). Importantly, the term "statement" in Rule 26(b)(3) is defined to mean:

> (A) a written statement signed or otherwise adopted or approved by the person making it, or (B) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement by the person making it and contemporaneously recorded.

*Id.* This portion of Rule 26 therefore assumes that the taking of a witness statement is entirely proper, even where the statement is recorded and transcribed by a court re-

porter, and the rule proceeds to address the circumstances under which the statement may be discoverable. In light of that, there would seem to be no basis for restricting Corley's chosen investigative method of taking sworn stenographic statements from potential non-party witnesses.[11] The Federal Rules of Civil Procedure do not prohibit that technique; the rules instead are concerned only with whether the statements are discoverable and with the uses to which they may be put at trial. *See* Wright & Miller, § 2027, at 410. We think it clear, therefore, that the district court committed an error of law in reading the Federal Rules to prohibit Corley from taking the sworn stenographic statements without complying with Rule 30(b). As a result, the district court should not have entered the protective order.

The question, then, is what impact the court's error had on its eventual decision to enter summary judgment for defendants, for we will reverse on the basis of an erroneous discovery decision only if there is a " 'clear showing that the denial of discovery resulted in actual and substantial prejudice to the complaining litigant.' " *Gile,* 95 F.3d at 495 (quoting *Searls v. Glasser,* 64 F.3d 1061, 1068 (7th Cir.1995)). Yet when the district court's legal error in discovery is considered in the context of the events leading up to the grant of defendants' summary judgment motion, we are convinced that the error caused Corley actual and substantial prejudice.

First, it is important to recall that the district judge entered the protective order before defendants had produced the names of other present and former Rosewood residents. Thus, although Corley had begun to gather sworn stenographic statements from potential non-party witnesses, he did not by that point know the identities of most of the other victims of defendants' scheme. And it would be those other residents and their family members who would be able to substantiate Corley's claim that others were similarly defrauded. Not only was the protective order in place when the names were finally produced, but the district court on the same day suspended an earlier-entered discovery schedule, stating that it would decide at a status hearing the following week what additional discovery would be permitted. Thus, by the time Corley obtained the names of Rosewood's other residents, formal discovery had been stayed, and a protective order was in place relating to Corley's private investigative technique.[12]

At the ensuing status hearing, defendants' counsel proposed that the court keep the stay of discovery in place until it determined on summary judgment whether Corley had a viable RICO claim. Not surprisingly, Corley's counsel objected to that proposal, noting that the district court had already sustained Corley's complaint and indicating that a summary judgment motion addressed to the RICO claim should not be considered before discovery was complete. Indeed, counsel stated that he would respond to a request for summary judgment with a motion for additional discovery under Fed. R. Civ. P. 56(f). The district court decided that the parties initially should brief the adequacy of the notices of claims of additional predicate acts and that in the meantime, discovery would remain stayed. The court told the parties that after it had determined whether the claims of additional predicate acts would remain a part of the case, it would then consider what additional discovery to allow.

---

11. *In practical terms, such a statement is no different from obtaining a sworn affidavit from the same non-party witness. In fact, counsel told us at oral argument that Corley was taking the sworn statements to facilitate the formulation of affidavits that would be submitted in response to defendants' anticipated summary judgment motion.*

12. Defendants downplay the potential for prejudice even in that circumstance by suggesting that Corley still could have obtained affidavits from the nonparty witnesses despite the protective order. In theory, that may be true, but an interview of the witness would still seem a necessary precursor to procuring an affidavit. It is perhaps conceivable that Corley could fashion witness interviews that did not run afoul of the protective order, but how broadly the district court would read its order remains to be seen. In any event, we are reluctant to accept defendants' suggestion that Corley should have been required to adjust his investigative procedure to avoid any prejudice from the protective order when the technique he had chosen was itself perfectly valid.

After briefing addressed to the additional predicate acts was complete, the court indicated at an April 3, 1995 status hearing that it would be granting partial summary judgment to defendants on those claims, meaning that the additional predicate acts would not be considered a part of the RICO pattern. The court did not issue a written opinion at that time, but indicated that an opinion would be forthcoming. In addressing Corley's claim that additional discovery was needed as to the additional predicate acts, the court noted that such discovery was not required because the court would be assuming the truth of Corley's allegations. The court explained that even if true, the additional predicate acts were not sufficiently related to the core "bait and switch" scheme to form a part of the RICO pattern.

At a subsequent status hearing on April 12, the court solicited the parties' views on the future course of discovery in light of the court's impending ruling on the additional predicate acts. Corley's counsel indicated that he would prefer to see the court's opinion dismissing the additional predicate acts before proposing a further discovery schedule. The court agreed that that would be an appropriate course.[13] Before the court could issue its opinion, however, defendants filed a further motion for summary judgment, this time addressed to the entire RICO claim. Their motion asserted that Corley could not establish that defendants had engaged in a pattern of racketeering activity. As promised, Corley responded with a motion for additional discovery under Rule 56(f). In that motion, Corley explained that since the point at which the district court had sustained the adequacy of his complaint against defendants' motion to dismiss, he had been permitted no meaningful discovery. He pointed out that he had only received certain essential documents from defendants on February 1, 1995, but that the stay of discovery entered on that date had prevented him from conducting any formal discovery relating to those documents. Corley reminded the court, moreover, that it had previously agreed that he be given the opportunity to review the court's as yet unissued opinion granting partial summary judgment on the additional predicate acts before being required to propose a schedule for further discovery addressed to the core scheme. (R. 493.) In responding to Corley's Rule 56(f) motion, defendants made the following statement, which in our view is critical: "[I]t is clear from the Memorandum filed in Support of Defendants' Motion for Summary Judgment that no additional discovery is needed in this case, since, as a matter of law, Plaintiffs do not state a case *even assuming the truth of their allegations*." (R. 496, at 2 (emphasis added); *see also id.* ("Defendants' current motion for summary judgment is appropriate in that the Court has stricken several of Plaintiffs' allegations, and Defendants have treated the remaining allegations *as true*." (emphasis in original)).)

In eventually ruling on the summary judgment motion, however, the district court did not accept as true Corley's allegations with respect to other alleged victims of defendants' scheme. Rather, the court noted the complaint's allegations with respect to those victims but disregarded the allegations because "neither affidavits nor depositions" were proffered to support them. (R. 534, at 20.)[14] Moreover, in granting summary judgment on the RICO claim, the district court did not address Corley's claim that additional discovery was necessary. Instead, the court addressed discovery only in the context of the motion for partial summary judgment on the additional notices of claims. (*See id.* at 5 ("The Court assumed for the purposes of summary judgment that all matters alleged in the Notices of Claims were true.").) Thus,

---

13. Defense counsel took the position that no further discovery was required and indicated that he soon would be filing a summary judgment motion addressed to the entire RICO claim. When told of this, the district court explained that if defendants in fact moved for summary judgment before a further schedule was agreed upon, Corley could respond by filing a motion for additional discovery under Rule 56(f).

14. Curiously, in discussing the third *Morgan* factor in its opinion, the district court accepted the allegation in Corley's complaint that other nursing home residents had been victims of the "bait and switch" scheme. The court therefore found that Corley had alleged a wide variety of victims, which weighed in favor of finding the existence of a RICO pattern. (*Id.* at 22.)

despite agreeing with Corley at an earlier hearing that he should be permitted to review the court's opinion on the additional predicate acts before making a proposal about additional discovery on the RICO claim, the court granted summary judgment in the same opinion on both the additional predicate acts and on the RICO claim itself, and without addressing Corley's argument about additional discovery. And the point on which the court's opinion turned was the absence of any evidence to support the allegations about other victims of defendants' scheme to defraud. In light of this history, and particularly the conflicting signals Corley received, we believe he suffered actual and substantial prejudice from the district court's erroneous ruling in the course of discovery.[15] We therefore must reverse the summary judgment in defendants' favor and remand for further proceedings, including the opportunity for Corley to conduct further discovery addressed to the pattern requirement. In that regard, the district court is directed to vacate the January 24, 1995 protective order, which will have the effect of removing any restriction on Corley's ability to gather sworn stenographic statements or affidavits from potential non-party witnesses.

### D.

█ Before proceeding to the other appeals before us today, we pause to address one further issue relating to the RICO claim that was briefed to us here and that no doubt will be raised on remand. The district court held that certain predicate acts of mail fraud relating to Vera Corley's stay at Rosewood could not be considered part of the pattern of racketeering activity because they occurred after defendants' scheme had reached its fruition. The court found that the scheme came to fruition on December 31, 1989, when Corley mailed a letter to defendants complaining that he and his mother had been the victims of a classic "bait and switch." According to the court, Corley was aware by that point that he had been defrauded, and further mailings, such as Attorney Ukman's letter to the Illinois Attorney General in December 1990, were for the purpose of concealing defendants' involvement in an already discovered fraud and thus were not in furtherance of the scheme itself. (R. 357, at 7–10.) Defendants took this theory one step further below, arguing that any predicate acts of mail fraud relating to other residents of Rosewood that occurred after December 31, 1989 also could not be considered because those mailings occurred after the scheme had come to fruition. The district court did not address this argument once it found the summary judgment record devoid of any evidence supporting the broader scheme Corley had alleged. We consider the issue here, however, because it no doubt will recur on remand.

█ A mailing made after a fraudulent scheme has come to fruition generally will not constitute an act of mail fraud because the mailing will not be considered to be in furtherance of the scheme to defraud. See McDonald, 18 F.3d at 496; United States v. McClellan, 868 F.2d 210, 216 (7th Cir.1989); Spiegel v. Continental Illinois Nat. Bank, 790 F.2d 638, 649 (7th Cir.), cert. denied, 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986); see also United States v. Maze, 414 U.S. 395, 402–03, 94 S.Ct. 645, 649–50, 38 L.Ed.2d 603 (1974). But our case law makes clear that the full scope of the scheme alleged must be considered in determining whether a particular mailing was in furtherance of the scheme. United States v. Lack, 129 F.3d 403, 407 (7th Cir.1997); United States v. Ashman, 979 F.2d 469, 482 (7th Cir.1992), cert. denied, 510 U.S. 814, 114 S.Ct. 62, 126 L.Ed.2d 32 (1993); see also Schmuck v. United States, 489 U.S. 705, 711,

15. Corley filed a motion to reconsider the summary judgment ruling, and that motion was denied by Judge Mills after Judge Mihm's recusal. In addressing Corley's contention that inadequate discovery had been afforded before summary judgment was granted, Judge Mills too focused only on the claims of additional predicate acts and not on the core RICO scheme. Like Judge Mihm, Judge Mills simply noted that the claims of additional predicate acts had been assumed by the court to be true, meaning that no further discovery on those claims was required before summary judgment could be granted. (R. 578, at 2.) Judge Mills did not address Corley's further contention that his motion for additional discovery under Rule 56(f) should have been granted before summary judgment on the RICO claim was considered. (R. 565, at 13–15.)

109 S.Ct. 1443, 1448, 103 L.Ed.2d 734 (1989); *United States v. Wingate,* 128 F.3d 1157, 1162 (7th Cir.1997). In this case, then, we cannot look only to the scheme's effect on Corley and his mother, for Corley alleges that numerous others were similarly defrauded and that the scheme may even be ongoing today. In light of the broader-based scheme alleged, then, Corley's suspicion that he had been defrauded does not necessarily mean that the point of fruition had been reached— other victims presumably were still being harmed. *See Schmuck,* 489 U.S. at 711, 109 S.Ct. at 1448 (scheme alleged was not "a 'one-shot' operation" but "an ongoing fraudulent venture"); *United States v. Biesiadecki,* 933 F.2d 539, 545 (7th Cir.1991). The Ukman letter, for example, could still be in furtherance of the scheme despite being sent after Corley had expressed his suspicions because that letter denied the existence of any fraudulent activity and served to deflect regulatory attention away from defendants' operations. In that way, the Ukman letter could be said to have allowed the broader-based scheme alleged in Corley's complaint to continue unabated. *See Lack,* 129 F.3d at 408 (mailing is in furtherance of scheme if it helps "cloak the scheme with an aura of legitimacy, thereby preventing its detection and allowing it to continue"); *Wingate,* 128 F.3d at 1162 (mailing and telephone call furthered scheme by allowing it to continue without detection); *United States v. Laurenzana,* 113 F.3d 689, 694 (7th Cir.) (correspondence with prosecuting authorities furthered ongoing fraudulent venture by effectively postponing any action against the defendant), *cert. denied,* —— U.S. ——, 118 S.Ct. 240, 139 L.Ed.2d 170 (1997); *United States v. Cosentino,* 869 F.2d 301, 307 (7th Cir.) (misrepresentations made to Department of Insurance allowed scheme to continue longer than it otherwise would have), *cert. denied,* 492 U.S. 908, 109 S.Ct. 3220, 106 L.Ed.2d 570 (1989). Thus, on remand, the Ukman letter should not be disregarded simply because it was mailed after the point at which Corley began to suspect that he may have been the victim of fraud.

And from what we have said about the Ukman letter, it should be plain that mailings made after December 31, 1989 to other potential victims of defendants' scheme may still satisfy the "in furtherance" requirement. The fact that Corley may have discovered that he was being defrauded does not automatically bring to fruition the wide-ranging scheme alleged herein.

### III.

■ Corley's second appeal (No. 96–3758) challenges the district court's September 26, 1996 order awarding $5,370.68 in costs to HSM Management Services, Inc. ("HSM"). Corley contends that this order is erroneous because it awards costs to a non-party to the litigation. Yet Corley's second appeal is effectively mooted by our decision on his first appeal. Having reversed the summary judgment for defendants on the RICO claim, we also must vacate the costs awarded on that claim, for defendants are no longer "prevailing parties" under Fed.R.Civ.P. 54(d).

Which leads us to Corley's remaining appeals, the first (No. 97–1815) relating to a $200 sanction assessed by the lower court on March 25, 1997, and the second (No. 97–2052) relating to the district court's April 25, 1997 order specifying the form of bond Corley was required to post to ensure payment of the earlier-imposed costs. Some background on these orders is necessary to place Corley's final two appeals in a proper context.

The court awarded costs to HSM relating to Corley's RICO claim on September 26, 1996. After Corley's first two appeals were filed, defendants asked the district court to require Corley to post a bond covering those costs in accordance with Fed. R. App. P. 7.[16] The district court obliged on February 28, 1997, ordering Corley "to file a bond or provide other security in the amount of $5,370.68 along with interest from the date of the judgment in order to ensure payment of

---

**16.** That rule provides as follows:

The district court may require an appellant to file a bond or provide other security in such form and amount as it finds necessary to ensure payment of costs on appeal in a civil case. The provisions of Rule 8(b) apply to a surety upon a bond given pursuant to this rule.
Fed. R.App. P. 7.

costs on appeal." (R. 632, at 3.) On March 14, 1997, Corley filed a motion for directions relating to the cost bond or other security. In that motion, Corley purported to be confused about the identity of the party in whose favor the bond should issue and about what other security would comply with the court's order. Corley proposed three possible forms of security in his motion, asking the district court to approve one as well as the rate of interest to be applied. (*See* R. 633.) Defendants responded by labeling Corley's motion frivolous; they requested a $300 sanction to cover the cost of their response. (R. 634.) On March 25, 1997, the district court denied the motion for directions and ordered Corley to file a bond in favor of HSM in the amount of $5,750. The court also imposed a $200 sanction against Corley to compensate defendants for their attorney's fees in responding to the motion. Corley appealed the $200 sanction to this court.

On April 3, 1997, Corley filed what purported to be a bond in compliance with the court's order. Yet Corley's "bond" merely obligated him to pay $5,750 to HSM in the event that his first two appeals were unsuccessful. Not surprisingly, defendants objected to the form of Corley's bond, arguing that Fed. R.App. P. 8(b) requires a bond with a surety who is bound along with the principal to make good on the payment obligation. Defendants again requested that sanctions be imposed in an amount sufficient to cover the fees they incurred in filing their objection. By its order of April 23, 1997, the district court denied the request for sanctions but agreed with defendants that Corley's bond required a surety. The court therefore ordered Corley to file a proper bond naming a surety to be bound along with the principal. Corley took one last appeal (No. 97–2052) from the April 23, 1997 order, but he also complied with that order by filing a bond along with a document binding his counsel as surety.

▮ Preliminarily, we find that the last of Corley's four appeals (No. 97–2052) is moot in light of our decision to reverse the summary judgment and to vacate the cost award on the RICO claim. Challenged in that appeal is the April 23, 1997 order addressed to the form of the bond. Corley argues that the district court lacked jurisdiction to enter that order because defendants' objection to the form of the bond was untimely under Fed. R.Civ.P. 59(e). Defendants countered by asserting that their objection was not a Rule 59(e) motion at all and that the court had jurisdiction to consider whether the bond filed by Corley complied with the court's earlier order. We need not resolve the matter here, however, because any question about the form of the bond was rendered moot when we vacated the cost award. As we said earlier, the condition attached to the bond, and therefore to counsel's obligation as a surety, was that the summary judgment and cost award in defendants' favor be affirmed by this court. But they were not, and once we reversed the summary judgment and vacated the cost award, the existence and form of the bond became immaterial because the underlying obligation secured by the bond no longer exists. Thus, even if Corley is correct that the district court lacked jurisdiction to enter the April 23, 1997 order, a decision to that effect would not impact his rights under the bond or the rights of his counsel as surety. For these reasons, Appeal No. 97–2052 is dismissed as moot.

▮ Yet a live controversy remains with respect to the $200 sanction (No. 97–1815). Defendants contend that this appeal also was mooted when Corley paid the sanction. But that cannot be. We have said that when a party or its counsel are sanctioned in the course of litigation, immediate payment of the sanction is the cost the two must bear for the privilege of continuing to litigate. The propriety of the sanction may then be challenged on appeal once there is a final decision in the case, even if that is long after the sanction was paid. *Cleveland Hair Clinic, Inc. v. Puig,* 104 F.3d 123, 126 (7th Cir. 1997); *see also Cleveland Hair Clinic, Inc. v. Puig,* 106 F.3d 165, 166, 168 (7th Cir.1997). Payment of the sanction does not moot the appeal because the appellate court can fashion effective relief to the appellant by ordering that the sum paid in satisfaction of the sanction be returned. *See Cleveland Hair Clinic,* 104 F.3d at 126; cf. *McKinney v.*

*Indiana Michigan Power Co.*, 113 F.3d 770, 772–73 (7th Cir.1997) (compliance with order assessing jury costs did not prevent counsel from challenging the order because amount paid could be returned to him if he were to prevail). That is the case here—defendants could be ordered to return the $200 if Corley should succeed on his appeal. As a result, Corley's appeal of the $200 sanction was not mooted when the sanction was paid.

■ With respect to the merits of that order, Corley contends that even if the district court believed the motion for directions to be frivolous, it had no authority to impose a sanction under Fed.R.Civ.P. 11. That is because defendants failed to comply with two procedural requirements of that rule: (1) that a request for sanctions be made in a separate motion rather than as an appendage to another motion or responsive memorandum, and (2) that the party to be sanctioned be given a twenty-one day safe harbor in which to withdraw or correct the allegedly offending filing. Fed.R.Civ.P. 11(c)(1)(A). Defendants failed to comply with either of these provisions, as they requested sanctions in their response to the motion for directions, and the district court imposed the $200 sanction four days later, without waiting for any response from Corley. Defendants concede, in fact, that sanctions under Rule 11 would be improper in these circumstances. *See, e.g., Johnson v. Waddell & Reed, Inc.*, 74 F.3d 147 (7th Cir.1996) (district court's failure to comply with procedural requirements of amended Rule 11 constitutes an abuse of discretion, requiring sanction to be vacated); *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1328–29 (2d Cir.1995) (sanctions vacated for failure to comply with separate motion and safe harbor requirements of amended rule). Yet defendants contend that the sanction here was not entered pursuant to Rule 11 at all because they never invoked that rule in requesting sanctions, nor did the district court reference the rule in imposing the sanction. Defendants suggest, rather, that the district court relied on its inherent power when it sanctioned Corley for filing a frivolous motion. In that circumstance, defendants argue, the separate motion and safe harbor requirements of Rule 11(c)(1)(A) are inapplicable.

But the district court also did not expressly invoke its inherent power when it imposed the sanction. Indeed, the court's brief sanction order invokes no authority at all but appears to speak the language of Rule 11. For instance, the court characterized Corley's motion for directions as "frivolous" and representative of the plaintiff's penchant for filing "motions which fly in the face of both the Court's earlier orders and the Federal Rules of Civil Procedure." (R. 635, at 2.) Moreover, there is no indication from the court's order that the allegedly sanctionable conduct could not be adequately addressed under Rule 11, a circumstance that may lead a court to invoke its inherent power. Indeed, Corley's allegedly sanctionable conduct would seem to fall squarely within the rule, as he filed a "written motion" that the district court deemed frivolous and thus sanctionable. *See* Fed.R.Civ.P. 11(b). But to the extent the district court intended to impose the sanction under Rule 11, it clearly abused its discretion, for neither defendants nor the court complied with the rule's procedural requirements. *See Johnson*, 74 F.3d at 151–52.

■ Nor in our view can the sanction stand as an invocation of the district court's inherent power. Although it is true that a district judge is not forbidden from relying on its inherent power to impose a sanction for conduct that also would be sanctionable under Rule 11, the Supreme Court has indicated that a sanction under the inherent power is appropriate only where the party "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46, 50, 111 S.Ct. 2123, 2133, 2135–36, 115 L.Ed.2d 27 (1991) (internal quotations omitted); *see also Runfola & Assoc., Inc. v. Spectrum Reporting II, Inc.*, 88 F.3d 368, 375 (6th Cir.1996); *Gillette Foods Inc. v. Bayernwald–Fruchteverwertung, GmbH*, 977 F.2d 809, 813–14 (3d Cir. 1992) (prerequisite to a sanction under the inherent power is a finding of bad faith). The district court made no finding here that Corley acted in bad faith in filing the motion for directions. Moreover, if the court was relying on its inherent power to sanction a

**1059**

bad-faith filing, it should have specifically so stated, along with delineating its reasons for finding bad faith. The court also should have explained why Rule 11 was inadequate to serve the court's purposes, for as the Supreme Court observed in *Chambers*, "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power." 501 U.S. at 50, 111 S.Ct. at 2136; *see also Mark Indus., Ltd. v. Sea Captain's Choice, Inc.*, 50 F.3d 730, 732 (9th Cir.1995) (inherent power to sanction generally should be invoked only if statutes or rules are not up to the task).

Both this court and the Supreme Court have emphasized, moreover, that the inherent power must be invoked with the utmost caution, particularly where the matter under consideration "is governed by other procedural rules, lest ... the restrictions in those rules become meaningless." *Kovilic Const. Co. v. Missbrenner*, 106 F.3d 768, 772–73 (7th Cir.1997); *see also Chambers*, 501 U.S. at 44 & 50, 111 S.Ct. at 2132–33 & 2135–36. That is a significant consideration here because defendants' suggestion that the sanction was an appropriate exercise of the court's inherent power, even if a technical violation of the procedural requirements of Rule 11, would have the effect of rendering Rule 11's separate motion and safe harbor provisions meaningless. As we have indicated in the past, " 'where the rules directly mandate a specific procedure *to the exclusion of others*, inherent authority is proscribed.' " *G. Heileman Brewing Co. v. Joseph Oat Corp.*, 871 F.2d 648, 652 (7th Cir.1989) (quoting *Landau & Cleary, Ltd. v. Hribar Trucking, Inc.*, 867 F.2d 996, 1002 (7th Cir.1989)) (emphasis added in *G. Heileman Brewing*). And even if Rule 11's new procedural requirements would not strictly curtail the procedures necessary for a sanction under the inherent power, even that type of sanction requires notice and an opportunity to respond. *See Larsen v. City of Beloit*, 130 F.3d 1278, 1286–87 (7th Cir.1997) (inherent power should be exercised by issuance of a rule to show cause or a similar procedure rather than by the sudden imposition of sanc-

tions). Corley was afforded no such opportunity here.

The $200 sanction cannot stand either under Rule 11 or under the court's inherent power, and that sanction is therefore vacated. On remand, the district court should ensure that defendants return the $200 that Corley paid them in satisfaction of the sanction order.

### IV.

For the foregoing reasons, we REVERSE the summary judgment entered on Corley's RICO claim and REMAND that claim for further proceedings consistent with this opinion. We also VACATE the award of costs to defendants entered on that claim. We further VACATE the $200 sanction the district court imposed on Corley for filing a frivolous motion. Finally, we DISMISS Appeal No. 97–2052 as moot. Corley shall recover his costs on these appeals.